MILNER, In re. See Case No. 740.

MILNER (BAILEY v.). See Case No. 740.

## Case No. 9,619.
### MILNER v. PENSACOLA.
[2 Woods, 632;[1] 2 Am. Law T. Rep. (N. S.) 186.]

Circuit Court, N. D. Florida. March Term, 1875.

RAILROAD COMPANIES—MUNICIPAL BONDS IN AID OF—LEGISLATIVE ACT—CONSENT OF VOTERS—REPEAL OF MUNICIPAL CHARTER—CONSTITUTIONAL LAW.

1. Where an act of the legislature authorized the mayor and aldermen of a city, "with the consent of a majority of the corporation comprising said city," to subscribe money to any railroad leading from the city, and to borrow money to pay the same: *Held*, that there was thereby conferred upon the municipal officers power to issue bonds to pay the subscription.

2. Under authority of such a law, the mayor and aldermen of the city of Pensacola subscribed a large sum to aid the construction of a railroad from the city of Pensacola, and, in payment thereof, issued negotiable bonds payable to bearer in twenty years, which, on their face, stated that they were issued in conformity with the law. In a suit brought by an innocent holder for value on the coupons belonging to said bonds, it was *held* to be no defense to the action; that at the election to obtain the "consent of a majority of the corporation comprising said city" to such subscription, only a minority of the citizens voted; nor that the question submitted to the citizens was whether the subscription should be made to construct a railroad from Pensacola to Montgomery, and the subscription was actually made to construct a railroad from Pensacola to the state line.

3. A construction of a law which would impute to the legislature a design to perpetrate an unconscionable and barefaced fraud ought to be avoided, if it can be fairly and reasonably done.

4. This rule applied to the acts of the legislature of Florida providing for the incorporation of cities and towns. approved August 6, 1868, and February 4, 1869.

[Approved in Broughton v. Pensacola, 93 U. S. 270.]

---

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

5. It is not within the power of a legislature, by a repeal of the charter of a municipal corporation, to invade the rights of its creditors and cancel its indebtedness. Such legislation impairs the obligation of contracts and is unconstitutional.

[Cited in State v. Natal (La.) 1 South. 926; Bates v. Gregory, 89 Cal. 397, 26 Pac. 894.]

This cause was heard upon demurrer to the pleas. The action was brought to recover the amount due on a large number of interest coupons attached to bonds issued by the city of Pensacola. The following is a copy of one of the bonds: "Issued in conformity with the 2d section of an act amendatory of an act to amend the act incorporating the city of Pensacola, passed by the legislature of the state, December 29, 1852, and approved by the governor, January 3, 1853. City of Pensacola, State of Florida: Know all men by these presents, that the city of Pensacola is indebted to the Alabama & Florida Railroad Company of Florida, or bearer, in the sum of five hundred dollars; which sum, the said city engages to pay in current money of the United States at the office of the city treasurer, to the said Alabama & Florida Railroad Company of Florida, or bearer, in twenty years from the date hereof, with interest at the rate of seven per cent. per annum, payable semiannually on the first day of July and the first day of January in each year, on the delivery of the interest coupons attached, in the city of New York, at such bank as the treasurer of the city of Pensacola shall direct. Pensacola, January 1, 1858. Francis B. Bobé, Mayor. F. E. de la Rua, Treasurer." The following is a copy of one of the coupons sued on: "$17.50. City of Pensacola. $17.50. City Bond No. 38, for $500. Interest coupon for seventeen $50/100 dollars, due in New York, July 1, 1872. No. 29. F. E. de la Rua, Treasurer." The other bonds are of the same tenor save as to letter and number; and the coupons, save as to number and date of payment.

The plaintiff averred that, as the administrator of Willis J. Milner, he was the owner and bearer of one hundred and eight of these bonds, and of interest coupons cut therefrom and past maturity, which amounted to $36,662.50, and for this amount he asked judgment.

The second section of the act, approved January 3, 1853, referred to upon the face of the bonds as the authority for their issue, is as follows:

"Sec. 2. Be it further enacted, that the mayor and board of aldermen of the city of Pensacola, with the consent of a majority of the corporation composing said city, be and they are hereby authorized to subscribe in the name of the city of Pensacola any amount of money which they may deem necessary to any plankroad or railroad leading from the city of Pensacola; and for the purpose of procuring the amount of subscription, the said city of Pensacola shall have power to borrow the same and shall have power to impose a tax on real estate in said city at a rate not exceeding two per centum on the assessed value of such property."

Pensacola was incorporated as a town by a special but public act of the legislature, passed in 1839. By another special act, passed in 1856, it was incorporated as the city of Pensacola. Prior to the adoption of the constitution of 1868, all the cities and towns of the state were incorporated by special act. The constitution of 1868, provided (article 4, § 21) that "the legislature shall establish a uniform system of county, township and municipal government." To carry out, as it is presumed, this provision of the constitution, an act was passed by the legislature, and approved August 6, 1868, entitled "An act to provide for the incorporation of cities and towns, and to establish a uniform system of municipal government in this state." [Laws 1868, p. 111.] This act provided that the male inhabitants of any hamlet, village, or town in the state, not less than one hundred in number, might establish for themselves, a municipal government, with corporate powers and privileges under the provisions of the act. It then proceeded to declare how such municipal governments might be organized, and what should be their powers and liabilities; in short, to provide for a general system of municipal government. Section 30 of the act was as follows: "That all the powers and privileges conferred in and by this act may be exercised by any city or town within the limits of this state heretofore incorporated; and it shall be lawful for any previously incorporated city or town to reorganize their municipal government under the provisions thereof by a voluntary surrender of their charters and privileges, and by an organization under this act; and upon a failure on the part of any incorporated town or city to accept the provisions of this act within six months after its approval, all the acts vesting such city or town with power are hereby repealed."

Afterwards the legislature passed an act, which was approved February 4, 1869 [Laws 1869, p. 22], having the same title as the act just referred to, and having in view the same general purpose. The 30th section of this act is identical with the 30th section of the act of August 6, 1868, save that nine months instead of six months were prescribed as the time within which cities and towns were to accept the provisions of the act; and in default of which, all acts vesting such city or town with corporate power were repealed. The act approved February 4, 1869, repealed the act of August 6, 1868.

It appears from the pleas that the city of Pensacola, within six months after the passage of the act of 1868, surrendered its original charter and privileges, and reorganized its municipal government under that act. But that city failed to surrender its charter and privileges within nine months after the approval of the act of 1869, and to reorganize under that act, but that the same city of Pen-

sacola with the same territorial limits, immediately after the expiration of said nine months, organized under the provisions of the first six sections of the act of 1869, which prescribe how the inhabitants of any hamlet, village, or town in the state, not less than fifty in number, may establish for themselves a municipal government.

On the 3d of February, 1870, the following act of the legislature was approved and became a law [Laws 1870, p. 41]:

"An Act Relating to Cities.

"Whereas, the legislature of this state, by the passage of an act entitled an act to provide for the incorporation of cities and towns, and to establish a uniform system of municipal government in this state, approved February 4, 1869, did not intend said act to affect the organization of any city or town made under or by virtue of an act entitled an act to provide for the incorporation of cities and towns, and to establish a uniform system of municipal government in this state, approved August 4, 1868; therefore the people of the state of Florida, represented in senate and assembly, do enact as follows:

"Section 1. That all acts, doings, and proceedings made and had, or hereafter to be made and had, by any mayor, board of councilmen, or any other city officer in any city of this state, organized in pursuance of an act entitled an act to provide for the incorporation of cities and towns, and to establish a uniform system of municipal government in this state, approved August 4, 1868, and while in the performance of their duties under said organization, are hereby declared legal and valid."

H. A. Herbert and E. A. Perry, for plaintiff.

A. E. Maxwell and G. A. Stanley, for defendant.

WOODS, Circuit Judge. The defendant pleads the general issue and six special pleas, which, however, set up but two substantial defenses to the action.

The first of these special defenses is in effect as follows: That the authority to incur the indebtedness for which the bonds were issued was dependent upon the consent of a majority of the corporation composing said city, and that at the election held to decide whether the city would incur said indebtedness, only ninety-five votes were cast, which was not a majority of said corporation; and the question submitted to the voters was whether the city should subscribe to the stock of a railroad leading from Pensacola to Montgomery, in the state of Alabama, and not to a railroad leading from Pensacola to the Alabama state line. The plea which sets up this defense fails to present one of the questions which the pleader intended to present, by neglecting to aver that the subscription stock was actually made in a company which was only authorized to build, and only did build a railroad from Pensa-

cola to the Alabama state line. We will, however, consider the plea as if such averment were made. The evident meaning of the second section of the act approved January 3, 1853, above quoted, is that the city of Pensacola may, upon a condition therein named, subscribe to the capital stock of any plankroad leading from the city of Pensacola, and may borrow the money to pay the amount of its subscription, and may levy a tax on the real estate of the city to pay the sum so borrowed, principal and interest. The authority given by this enactment is ample to cover the acts done by the mayor and aldermen of the city. They subscribed the stock in a railroad leading from Pensacola, and, to raise the money to pay for it, issued the bonds, a portion of which are in controversy in this action.

The power to borrow money conferred upon a municipal corporation implies the power to issue bonds and interest coupons on which to negotiate the loan. Rogers v. Burlington, 3 Wall. [70 U. S.] 654. But the defendant insists that a majority of the voters of the city did not vote for the subscription of money to the railroad, and that the railroad in behalf of which the vote was taken was a road leading from Pensacola to Montgomery, and not a road from Pensacola to the Alabama state line. Do these facts constitute a defense to these bonds and coupons in the hands of a bona fide holder? The authorities are adverse.

"When a corporation has power, under any circumstances, to issue negotiable securities, the bona fide holder has a right to presume that they were issued under the circumstances which give the requisite authority, and they are no more liable to be impeached for any infirmity in the hands of such a holder than any other commercial paper." See Gelpcke v. Dubuque, 1 Wall. [68 U. S.] 203, and numerous cases there cited. See, also, Moran v. Miami Co., 2 Black [67 U. S.] 722; Mercer Co. v. Hacket, 1 Wall. [68 U. S.] 83; Van Hostrup v. Madison City, Id. 291; Meyer v. Muscatine, Id. 384; Mygatt v. Green Bay [Case No. 9,998]; Seeling v. City of Racine [Id. 12,631]; Supervisors v. Schenck, 5 Wall. [72 U. S.] 772.

In the case of Commissioners of Knox Co. v. Aspinwall, 21 How. [62 U. S.] 545, it was held that "when the bonds on their face import a compliance with the law under which they were issued, the purchaser is not bound to look further. The decision of the board of commissioners may not be conclusive in a direct proceeding to inquire into the facts before the rights and interests of other parties had attached; but after the authority has been executed, the stock subscribed, and the bonds issued and in the hands of innocent holders, it would be too late, even in a direct proceeding, to call it in question."

The case of Marsh v. Fulton Co., 10 Wall. [77 U. S.] 676, is relied on to support the defense under consideration. All that was

decided in that case was, that where the commissioners of a county are authorized to subscribe to the capital stock of a particular corporate body, that does not authorize a subscription to the stock of another corporation, and that the bonds issued to pay for such stock are issued without authority, and are therefore void. That is not this case. Here the city was authorized to subscribe to any plankroad or railroad leading from the city of Pensacola. The pleas show that the subscription was made to such a railroad. The subscription was therefore covered by the authority of the law. If there was any informality in the election by which the consent of the citizens of Pensacola was to be obtained to the subscription, that brings the case precisely within the authorities above cited. I am of opinion, therefore, that the defense under consideration is no answer to the action.

The defense mainly relied on is the second. This may be thus stated: After the bonds and coupons named in the declaration were issued by the city of Pensacola, the charter under which it was organized was repealed, and the municipal body known as the city of Pensacola ceased to exist, and the present city of Pensacola was organized under another law, and is a distinct and different municipal corporation from that which issued the bonds. Therefore, the present city of Pensacola is not liable on these bonds and coupons. In other words, it is claimed that the city of Pensacola, as a municipal corporation, ceased to exist, by its failure to adopt the provisions of the act of February 4, 1869, within nine months after the approval of that act; that as a consequence, all the debts and obligations incurred by the city prior to February 4, 1869, were canceled and destroyed; and that the present city of Pensacola having been organized under the act of 1869, though by the same inhabitants, and covering the same territory, and with substantially the same powers, is relieved of any obligation to pay the debts of the city incurred prior to February 4, 1869. The legislation which produces such effects ought to be clear and explicit. To ascribe a purpose to accomplish such results, to the legislature of Florida, would be to charge it with an attempt to perpetrate a most unconscionable and barefaced fraud. I do not believe that the legislature of Florida had any such purpose, or that its legislation, fairly construed, can have any such result. A construction of the law which sustains such a purpose ought to be avoided, if it can be fairly and reasonably done, consistently with the terms of the act.

A careful reading of the acts of 1868 and 1869 shows that the purpose of those acts was not to destroy the municipal corporations already existing in the state, but to carry out the requirements of the constitution by establishing a uniform system of municipal government in the state, and to rehabilitate the existing municipal bodies with new and uniform privileges and powers. The language of section 30 of both the acts carries this idea: "All the powers and privileges conferred in and by this act may be exercised by any city or town within the limits of this state heretofore incorporated." Had the section stopped here, there could be no pretense that its effect was to create new corporate entities. But it proceeds to declare that "it shall be lawful for any previously incorporated city or town to reorganize their municipal government under the provisions thereof, by a voluntary surrender of their charters and privileges, and by an organization under this act." This clause provides for the "reorganization," not the destruction, of municipal corporations. It does not provide for a new corporate entity. If it did, it would follow that every time a city or town received a new charter, it became a new corporate body, which is not the case. Mayor, etc., of Colchester v. Seaber, 3 Burrows, 1866. The language of the section thus far seems to recognize the continued and unbroken life of the cities and towns reorganized under the act. The last clause of the section which, upon a failure of an incorporated town or city to accept the provisions of the act within nine months, repeals the acts vesting such city or town with corporate powers, does not necessarily destroy the corporate existence of such city or town.

Dillon, in his learned work on Municipal Corporations, says (volume 1, § 116): "Where the functions of an old corporation are suspended, or where the corporation by loss of all its members, or of an integral part, is dissolved as to certain purposes, it may be revived by a new charter, and the rights of the old corporation granted over to the same or a new set of corporators, who in such case take all the rights and are subject to all the liabilities of the old corporation of which it is but a continuation." The text is sustained by the citation of the following, among other authorities: Rex v. Pasmore, 3 Term R. 199, 247; Reg. v. Ballivos, 1 P. Wms. 207; Mayor, etc., of Colchester v. Brooke, 7 Q. B. 383. My construction of the latter part of section 30 is, that it provided merely for a suspension of the powers of the municipal corporations failing to reorganize under the act, and not for a dissolution of the corporation itself.

As soon, therefore, as the city of Pensacola organized under the first six sections of the act, it was simply the assumption by the city of the new powers and privileges which the act conferred, and was not the creation of a new corporation. That it was not the purpose of the legislature to give the effect to the act of 1869, claimed by defendant, is apparent from the enactment of the legislature of Florida, approved February 3, 1870, entitled "An act relating to cities," and copied at large in the statement of the case. I am of opinion, therefore, that the failure

of the city to reorganize under the act of 1869, within nine months after its passage, did not put an end to the corporate existence of the city of Pensacola, and that its subsequent reorganization under the first six sections of the act did not create a new, but was merely the rehabilitation of an old corporate body.

But conceding that the effect of the acts of August 6, 1868, and February 4, 1869, and of the failure of the city of Pensacola to reorganize under the latter act, was what the defendant claims, and that it was the purpose of the legislature to accomplish that result, the question remains, was it competent for the legislature to destroy a municipal corporation, or to put it in its power to destroy itself, so as to cancel and wipe out its debts and liabilities?

It was held by Judge Story, in Mumma v. Potomac Co., 8 Pet. [33 U. S.] 281, that a private corporation might be dissolved by the legislature, or by judicial sentence, and that such dissolution did not impair the obligation of a contract any more than the death of an individual impairs the obligation of his contract. He placed this view on two grounds: (1) Because the obligation survives and the creditors may enforce their claims against any property belonging to the corporation; and (2) because every creditor is presumed to contract with reference to the possibility of the dissolution of the corporate body. The case is different with a municipal corporation. The main, and in most cases the only source from which creditors of a municipal corporation can expect to receive payment of their claims is found in the power of taxation. The dissolution of the corporation of course puts an end to its power of taxation, and renders the collection of debts owing by it an impossibility.

Now, in the case of these bonds, the act which authorized the indebtedness for which they were issued also provided for the levy of a tax to pay the indebtedness. That provision for taxation was as much a part of the contract between the city of Pensacola and the bondholder as if it had been inserted in the body of the bond. A repeal of the tax provision would have impaired the obligation of the contract, and would have been a violation of the constitution of the United States.

In the case of Von Hoffman v. Quincy, 4 Wall. [71 U. S.] 535, the result of the decision of the court was, that when a statute authorized a municipal corporation to issue bonds and to exercise the power of local taxation to pay them, and persons have bought and paid value for bonds issued accordingly, the power of taxation thus given is a contract within the meaning of the constitution, and cannot be withdrawn until the contract is satisfied. The state and the corporation in such cases are equally bound. See, also, Butz v. Muscatine, 8 Wall. [75 U. S.] 583; Welch v. St. Genevieve [Case No. 17,372]; U.

S. v. Treasurer of Muscatine Co. [Id. 16,538]. If the legislature cannot take from a municipal corporation the power of taxation conferred contemporaneously with the power to borrow money, and for the purpose of repaying the money borrowed, it would seem to follow a fortiori that it could not utterly destroy the municipal corporation which had issued the bonds on the faith of a law authorizing taxation to pay them; thus, not only repealing the power of taxation, but leaving no corporate entity in existence against which suit might be brought. How the obligation of a contract, made by a municipal corporation for the payment of money, could be more effectually impaired, it is difficult to conceive.

Upon this question, Dillon, in his work on Municipal Corporations (volume 1, § 114), says: "As respects creditors of a municipal corporation, their rights are protected from legislative invasion by the constitution of the United States, and no repeal of a charter of a municipal corporation can so dissolve it as to impair the obligation of the contract, or, it may probably be safely added, preclude the creditor from recovering his debt." In support of this view the learned author cites the following authorities: Cooley, Const. Lim. 290, 292; Curran v. Arkansas, 15 How. [56 U. S.] 312; Thompson v. Lee Co., 3 Wall. [70 U. S.] 327; Havemeyer v. Iowa Co., Id. 294; 2 Kent, Comm. 307, note; Board of Com'rs of Tippecanoe Co. v. Cox, 6 Ind. 403; Coulter v. Robertson, 24 Miss. 278; State v. Common Council of City of Madison, 15 Wis. 30; Blake v. Portsmouth & C. R. R., 39 N. H. 435.

My conclusion is, therefore, that no legislation of the state of Florida could so destroy the city of Pensacola as to relieve it from the obligation to pay the bonds issued by it; that the present city of Pensacola is the same corporate body as that by which the bonds were issued, reorganized and clothed with a new charter, and with new powers and privileges, it is true, but still the same municipal corporation, and liable to pay the bonds and coupons in controversy in this suit. Any other conclusion would produce the most monstrous results. It would put it in the power of every city and town in Florida to cancel all its indebtedness incurred prior to February 4, 1869, amounting to many hundred thousand dollars, and to set their creditors at defiance. It would enable every city which receives a new charter to repudiate all indebtedness contracted under its old one, and leave the holders of its bonds utterly without remedy. In my judgment, neither of the defenses set up by the special pleas is good in law.

The demurrer to the pleas must, therefore, be sustained.