Erwin v. State.

## GEORGE ERWIN *v.* STATE.

## (*Nashville.* December Term, 1905.)

1. **STATUTES.** Act passing only one reading in each house after its title is changed from an amending to a repealing statute is unconstitutional.

A statute (Acts 1901, ch. 446) entitled "An act to amend the charter of South Pittsburg" (Acts 1899, ch. 235), originating in the senate and passing its third reading in that body, and thereupon being transmitted to the house, where, after passing its second reading, its title, upon its third reading, is in terms amended, but in fact changed, so as to read "An act to repeal an act entitled" [here setting out the title of Acts 1899, ch. 235, which constituted the charter of South Pittsburg], "and to abolish said municipal corporation," which being returned to the senate, and said so called house amendment being concurred in, and thus being passed in this new form only on one reading in each house, is unconstitutional and invalid. (*Post, pp.* 74-82.)

Constitution cited and construed: Art. 2, secs. 17 and 18.

Acts cited and construed: 1899, ch. 235; 1901, ch. 446.

2. **SAME.** Act superseding old city charter with another creates a new municipal government in sense of statute prohibiting sale of intoxicating liquors in towns of certain population subsequently incorporated.

A statute (Acts 1901, ch. 360) purporting to be a new and independent municipal charter, embracing in the main the provisions of the old charter (Acts 1899, ch. 235), but containing numerous and important differences, by omissions and additions and containing a full scheme of city government, supersedes the former charter (Acts 1899, ch. 235), so that the city becomes a new municipal corporation within the sense of the statute (Acts 1899, ch. 221) prohibiting the sale of intoxicating

Erwin v. State.

liquors within four miles of any scholhouse within any incorporated town, thereafter incorporated, having a population of not more than two thousand inhabitants. (*Post, pp.* 74-76, 82-95.)

Acts cited and construed: 1899, chs. 221 and 235; 1901, chs. 360 and 446.

Cases cited and approved: Terrell v. State, 86 Tenn., 523; Manufacturing Co. v. Falls, 92 Tenn., 607; Chattanooga v. Neely, 97 Tenn., 667; Lewis v. Mynatt, 105 Tenn., 508; United States v. Tynen, 78 U. S., 88, 92; The Paquette Mahana, 175 U. S., 685; Murphy v. Utter, 186 U. S., 95, 104; Buford v. State, 72 Tex., 182, 184; Blessing v. Galveston, 42 Tex., 641, 658, et seq; Butner v. Boifeuillet, 100 Ga., 743, 750.

Cases cited and distinguished: O'Connor v. Memphis, 74 Tenn., 730, 735, 736, 743; Colchester v. Seaber, 3 Burrows, 1866; Milner v. Pensacola, 2 Woods, 632; Broughton v. Pensacola, 93 U. S., 266; Mobile v. Watson, 116 U. S., 289, 300, 301; Shapleigh v. San Angelo, 167 U. S., 646.

3. **SAME.** Same. **Act resuscitating repealed charter creates a new charter, so that intoxicating liquors cannot be sold within the town so incorporated, when.**

A statute (Acts 1905, ch. 220) erroneously assuming that a repealed statute (Acts 1899, ch. 235) was still in existence as the charter of the municipal corporation of South Pittsburg, and that the repealing statute (Acts 1901, ch. 360) was merely an amendment to it, and repealing the latter statute and another statute (Acts 1903, ch. 446) amending it, and purporting to amend said charter as contained in said former repealed statute (Acts 1899, ch. 235), created a new charter for said town of South Pittsburg, composed of the resuscitated charter (Acts 1899, ch. 235) and the amendments engrafted upon it by said Acts 1905, ch. 220, effective only from the date of its passage, and did not operate to continue the incorporation of said town under said old charter (Acts 1899, ch. 235); and because said statute (Acts 1905, ch. 220) is subsequent to the statute (Acts 1899, ch. 221) extending the four mile law (Acts

Erwin v. State.

1877, ch. 23, as amended by Acts 1885, ch. 123, and Acts 1887, ch. 167) to any incorporated town thereafter incorporated, having a population of not more than two thousand inhabitants, intoxicating liquors cannot be sold therein.     (*Post, pp.* 74-76, 95, 96.)

Acts cited and construed: 1899, chs. 221 and 235; 1901, ch. 360; 1903, ch. 446; 1905, ch. 220.

4.  **SAME.** Power of an incorporated town to regulate the sale of intoxicating liquors must remain in abeyance until the population reaches the requisite number, when.

The power to regulate the sale of intoxicating liquors contained in the legislative charter of a town must be construed in the light of the general statute previously enacted prohibiting the sale of such liquors in towns subsequently incorporated, having a population of not more than two thousand inhabitants, and the power must remain in abeyance until the population shall reach that fixed number. (*Post, pp.* 96, 97.)

5.  **SAME.** Construction to be made by the courts, and not by the legislature.

The power to construe statutes belongs to the judicial department of the government, and not to the legislative department, and any attempt of the legislature to construe former acts and to establish their relations is wholly futile. (*Post, p.* 96.)

FROM MARION.

Appeal from the Circuit Court of Marion County.— S. D. McReynolds, Judge.

Jno. J. Vertrees, Jos. Brown, C. C. Moore, and Byron Pope, for Erwin.

ATTORNEY-GENERAL CATES and BROWN & SPURLOCK, for State.

MR. JUSTICE NEIL delivered the opinion of the Court.

The plaintiff in error was indicted in the circuit court of Marion county for the unlawful sale of liquors in nineteen separate cases, was convicted and sentenced to pay a fine of $50 in each case, and ninety days' confinement in the county workhouse was imposed in each case. He has prosecuted an appeal to this court from the aforesaid judgments of conviction. All the cases have been tried here together, being substantially on the same facts. The plaintiff in error insists that he acted within the law in making the sale of liquors referred to, because he had a license from the authorities of the town of South Pittsburg, and that town was not under the operation of the law under which the indictments were framed, known as the "Four-Mile-Law."

The questions made for plaintiff in error by his counsel necessitate a review of the legislative history of South Pittsburg, since his right to sell depends upon the effect of the statutes which compose that history.

South Pittsburg was originally chartered in 1887 under a general corporation laws of 1875. This charter was amended on the 6th day of April, 1897. Acts 1897, p. 549, c. 238. On the 6th of April, 1899 (chapter 235, p. 510, of the Acts of that year), an act was passed to incorporate the town of South Pittsburg and to codify

all laws upon the subject into one act. On the 9th day of April, 1901 (chapter 446, p. 1071, of the Acts of that year), an act was passed purporting to repeal the above mentioned chapter 235, p. 510, of the Acts of 1899. On April 19, 1901 (chapter 360, p. 810, of the Acts of that year), an act was passed to incorporate the town of South Pittsburg, purporting to be a new charter for that town. On April 15, 1903 (chapter 446, p. 1256, of the Acts of that year), an act was passed purporting to amend the charter of South Pittsburg as contained in the said chapter 360, p. 810, of the Acts of 1901. On March 5, 1905 (chapter 220, p. 453, of the Acts of that year), an act was passed which purported to amend the charter of South Pittsburg as contained in chapter 235, p. 510, of the Acts of 1899. This act referred to chapter 360, p. 810, of the Acts of 1901, as "an amendment and continuation of the charter of South Pittsburg, Tenn., as contained in chapter 235, p. 510, of the Acts of 1899," and repealed the said chapter 360. It is also referred to chapter 446, p. 1256, of the Acts of 1903 above mentioned, as "An act which amended the charter of the town of South Pittsburg," and repealed it.

It is insisted for plaintiff in error that chapter 446, p. 1071, Acts of 1901, purporting to repeal chapter 235, p. 510, of the Acts of 1899, is void; that the said chapter 235 was still in force after the new charter act (chapter 360, p. 810, of the Acts of 1901) was passed, and the latter made no material change in the status. It is also insisted that in any event, Acts 1905, p. 453, c. 220, was

but a continuation of the said chapter 235, p. 510, of the Acts of 1899.

Hence, its is insisted that South Pittsburg, all the time since the passage of chapter 235, p. 510, of the Acts of 1899 has been existing under that law in its original and amended form.

It is insisted by the State, firstly, that chapter 235, was repealed by Acts 1901, p. 1071, c. 446; secondly, if this position be not well taken, then that it was repealed by chapter 360, p. 810, Acts of 1901; thirdly, that Acts 1905, p. 453, c. 220, has no real bearing upon the controversy.

The guilt or innocence of the plaintiff in error, accordingly as one view or the other of these controversies over the statutes may prevail, depends upon the provisions of chapter 221, p. 474, of the Acts of 1899, which in effect applies the four-mile law to towns thereafter incorporated having a population of 2,000 and under. South Pittsburg has a population of less than 2,000. If chapter 235, p. 510, of the Acts of 1899 is still in force or was in force June, 1905, when Erwin sold liquors in South Pittsburg, he committed no offense. If that act has been repealed then he sold without legal right and is guilty in all of the cases.

Was chapter 235, p. 510, of the Acts of 1899, repealed by chapter 446, p. 1071, of the Acts of 1901?

It is insisted by plaintiff in error that the latter act was not passed according to due constitutional formalities, and hence never became a law.

The bill originated in the senate and was known as "Senate Bill 367."

The following are the journal entries of the Senate:

March 19, 1901. Mr. Williams introduced Senate Bill No. 367, entitled "An act to amend the charter of South Pittsburg." Passed first reading. Senate Journal, p. 300.

March 20, 1901. Bill passed second reading. Senate Journal, p. 317.

March 26, 1901. Mr. Williams called up Senate Bill No. 367, "An act to amend the charter of South Pittsburg." The bill passed its third and final reading. Senate Journal, p. 376.

The following are the House Journal entries:

Thursday, April 4, 1901, Senate Bill 367, to amend an act incorporating South Pittsburg. Passed first reading. House Journal, p. 619.

April 5, 1901. Senate Bill 367. Passed second reading. House Journal, p. 656.

April 9, 1901. Senate Bill 367, to amend act incorporating South Pittsburg. Mr. Raulston moved to amend so as to repeal the charter of South Pittsburg. The amendment was adopted. The bill thereupon passed the third reading, and a motion to reconsider was laid on the table. House Journal, p. 687.

On return of the bill to the senate, the following occurred, viz:

April 11, 1901, Mr. Williams called up Senate Bill 367, "An act to amend the charter of South Pittsburg,"

on House amendment. On motion the House amendment thereto was concurred in. Senate Journal, p. 592.

April 12, 1901. The speaker of the senate announced his official signature to the bill. Senate Journal, p. 604.

On the same day the speaker of the house also announced his signature to the bill. House Journal, p. 763. Signed by the governor on April 11, 1901.

It is perceived that when the bill was introduced in the senate and passed its third reading in that body, it bore the tile of an act to amend the charter of South Pittsburg; and that on being transmitted to the house it passed its first and second reading under the same title, but that on the third reading in the house it was changed from an act to amend into an act to repeal the charter of South Pittsburg; that it was returned then to the senate, and in this form was concurred in by the senate, and when finally adopted it bore the title "An act to repeal an act entitled" (here settting out the title of chapter 235, p. 510, of the Acts of 1899), "and to abolish said municipal corporation," as appears from Acts 1901, c. 446, p. 1071.

It is observed that in its final form the act had only one reading in the house and one in the senate.

We think there can be no doubt as to the invalidity of the act.

The following principles are controlling:

The constitution declares: "Bills may originate in either house; but may be amended, altered, or rejected, by the other." Article 2, section 17.

"No bill shall become a law which embraces more than one subject, that subject to be expressed in the title." Id.

"Every bill shall be read once, on three different days, and be passed each time in the house where it originated, before transmission to the other. No bill shall become a law until it shall have been read and passed, on three different days in each house, and shall have received on its final passage in each house, the assent of a majority of all the members to which that house shall be entitled under this constitution; and shall have been signed by the respective speakers in open session, the fact of such signature to be noted on the journal; and shall have received the approval of the governor, or shall have been otherwise passed under the provisions of this constitution." Article 2, section 18.

Every bill has two parts, the title and the body.

The title must contain the subject of the proposed legislation, and that subject must be single. This was intended to serve a twofold purpose. The subject must be expressed in the title, so that the members of the legislature may have their attention drawn directly to the matter about which they are to concern themselves in the discharge of their legislative duties: a second purpose is that the people of the State may know what their representatives are doing, and may interpose, if they choose, by petition, or remonstrance. The title must be single, to prevent omnibus legislation and logrolling.

It is obvious that to serve these purposes, the title

must be a constant quantity, not subject to amendment, or at least not subject to any alteration that will effect any substantial change in it. It fixes the identity of the bill. There may, indeed, be made a substantial change in a title, but if so, it becomes a new title, the caption of a new bill.

What is said in the constitutional provisions, quoted, concerning amendments refers to the body of the bill. This, as a matter of course, may be amended in the house in which the bill originated. The constitution also permits amendments to be engrafted upon it in the other house. No restriction is placed upon this power of amendment further than results from the rigidity of the title and the necessity of conforming thereto, and the requirement that there shall be a concurrence of the two houses upon the whole bill. One section may be stricken out and its place supplied by another containing a different provision; all may be stricken out except the title and the enacting clause, and new provisions inserted quite different from those which first constituted the body of the bill, but upon this liberty there rests one unyielding limitation, one imperious requirement. Every amendment, be it great or small, must harmonize with the title, must be germane to it, must fall within its scope.

If an amendment foreign to the title be introduced, one of two results must follow; either the title must be so altered as to embrace it, or the bill, as it stands, will be vitiated by it; but if the title be so changed, the bill is

Erwin v. State.

no longer the same; the title is new, and the bill is radically different from the thing it was before.

Now to apply these principles to the case before us.

The title of the bill as it was originally introduced in the senate was "An act to amend" the charter of South Pittsburg. In this form the bill passed its three readings in the senate, and two readings in the house. On the third reading in the house the title was changed so as to read "An act to repeal" the charter of South Pittsburg.

Here was a radical change. To amend a bill is to preserve and improve it; to repeal it is to destroy it.

Upon this amendment being made in the title there was a new bill, a scheme of legislation proposed which was entirely different from that which had been originally introduced in the senate, had passed three readings there, had been transmitted to the house and had passed two readings in that body. It perished at this point, and a new and totally different bill took its place.

This new bill, that which now appears upon the statute book as chapter 446, p. 1071, of the Acts of 1901, passed only one reading in the house and one in the senate. Therefore it was never constitutionally passed, and was void.

We do not mean to be understood as holding that a true amendment, one that falls within the scope of the title, must itself pass three readings in each house. Such a requirement would make legislation in some instances

116 Tenn.—6

practically impossible. The three readings were imposed by the constitution for the purpose of giving opportunity for and inducing that reflection which not only tends to the destruction of bad legislation, but which suggests alterations and improvements, applied in the form of amendments upon defective bills. These may arise upon either reading, and may be disposed of upon either reading. If they arise in the house different from that one in which the bill originated, and are passed in such second house, it is sufficient upon the bill being returned that the amendments shall be concurred in by the house from which the bill originally came.

Chapter 446, p. 1071, Acts 1901, being void, chapter 235, p. 510, Acts 1899, was unaffected thereby.

The next question to be determined is whether the said chapter 235 was supplanted by chapter 360, p. 810, Acts 1901.

In order to a proper solution of this question, it is necessary that we should note the correspondencies between these two acts, and their differences.

Both acts embrace the same territory and the same people, and the latter is in the main, a copy of the former. An attentive examination and comparison of the two acts discloses the following divergencies in their provisions besides others of a minor character, which we need not note:

Article 1, section 5, of the old act contains a special reference to the charter of 1887 and to the amendment of January 22, 1897, repeals them, and declares that all

the property "belonging to the present city of South Pittsburg shall be and continue the property of said city as herein chartered, and all taxes due or to become due to the same shall be due to and collected by said city as hereinafter provided, and all obligations of said city evidenced by outstanding warrants, judgments or otherwise, shall be and remain a legal, subsisting obligation against said city as herein chartered, and payable in the manner as hereinafter provided." The new act substitutes for the section last mentioned the following: "Sec. 5. Be it further enacted, that all property, real, personal and mixed, belonging to the city of South Pittsburg, as formerly incorporated, shall vest in and become the property of the city of South Pittsburg, as incorporated in this act, and all taxes due or to become due to the said old corporation shall become due and collectible by the city of South Pittsburg as herein chartered, and all obligations of said former city, evidenced by its outstanding warrants, judgments against it, or otherwise, shall be and remain a legal subsisting obligation against said city of South Pittsburg as herein incorporated, and payable in the manner as hereinafter provided."

Article 2, section 1, of the new act, after fixing the same terms for the mayor and aldermen as in the former act, then continues:

"Provided, that T. M. Johnson, mayor of the former city, shall hold the office of mayor until the first regular election, and W. E. Carter, J. C. Smith, and T. L. Patton shall hold the office of aldermen, respectively, until the

regular election in 1902, and W. H. Wilson, W. R. Ladd, and Christian Baumgartner shall hold the office of aldermen, respectively, until the first election in 1901, this being the respective terms of office of each of said officers as elected in the old corporation. J. Bright shall be recorder of said city until the regular meeting in January, 1902, and J. F. Magee shall be the marshal of said city until the regular board meeting in January, 1902, and George Moran shall be treasurer of said city until the regular board meeting in January, 1902, this being the terms of office of each of the said officers under the former charter."

This is entirely new, there being nothing like it in the old act.

Article 2, section 2, of the old act requires that electors shall be freeholders, also that this shall be a necessary qualification for eligibility to the office of mayor or alderman. This provision is omitted in the new act, and it is declared to be sufficient that a qualified voter or a candidate for mayor or alderman shall be a bona fide resident of the city of South Pittsburg for at least one year next before the election.

Article 2, section 10, subsec. 9, of the old act, reads as follows:

"The board of mayor and aldermen shall have power by ordinance:   .   .   .   (9)   Exclusively to license and regulate billiard tables, bowling alleys and other places of public resort, *and to restrain and regulate the selling or giving away of intoxicating spirits, malt,*

*or mixed liquors, within the city, provided the privilege license levied for municipal purposes, on selling or tip- pling intoxicating liquors, including wines, ale or beer, shall not be less than $500 nor more than $1,000 per year."*

The new act omits all of the matter which we have italicized.

Upon the subject covered by the matter in italics, there is substituted in another part of the new act the following:

"In the event the inhabitants of the city of South Pittsburg shall at any time be sufficient to justify the sale of intoxicating liquors under the law, then and in that event, the board shall fix the license upon the sale of intoxicating liquors at not less than $500 nor more than $750 per annum. In case the board of mayor and aldermen shall fail to assess the amount of privileges to be collected from liquor dealers, the same is hereby levied at $500 per annum. But nothing herein shall be construed to authorize the sale of intoxicating liquors so long as the same is prohibited by the general laws of the State."

Article 2, section 10, subsec. 16, of the old act, provides that every male citizen over twenty-one and under fifty years of age, who has resided within the city for three months shall be liable to poll tax. The same sub-section of the new act makes the time six months.

Article 3, section 2, of the old act, gives the mayor power to remit fines, but requires that he shall "submit to the board his reasons for so doing." The correspond-

ing section of the new act gives the mayor power to remit fines "upon the written recommendation of three aldermen," and further provides that this recommendation with the mayor's action thereon, shall be delivered to the recorder and read at the next regular meeting of the board.

Article 3, section 7, of the old act, provides that, in case of a vacancy in the office of mayor in the board of mayor and aldermen, such vacancy shall be filled at once by the qualified voters of the city at a special election called for that purpose. The corresponding section of the new act provides that such vacancy shall be "filled by the board until the next regular election."

Article 3, section 14, limits the compensation of the city treasurer to two per cent. on the revenues received by him. The corresponding section of the new act makes the limit one per cent.

The following appears in the new act and not in the old, contained in article 3, section 15:

"The recorder, before entering upon the duties of his office, shall file with the treasurer an official bond in the sum of $10,000, approved by the board, and an oath in writing, sworn to before some legally qualified officer, that he will faithfully discharge his duties as recorder and support and enforce the provisions of the charter and ordinances of the city and general laws of the State. The city recorder shall receive such compensation as the board may allow, which shall not be less than $20 nor more than $30 per month, and no fees, except in the trial

of state and civil cases and perquisites accruing to him by reason of his office as recorder, and all fees in city cases shall be entered in a well-bound book and turned into the city treasury as other revenue, and the recorder's monthly report to the board shall include an itemized statement, showing the amount of fees and the source, thereof, whether collected or not."

Article 4, section 2, of the new act, provides: "That the board of mayor and aldermen shall have power by resolution, upon the application of any citizen to correct any error or inequality in the city assessment at any time before the taxes are due."

There is no similar provision in the old act.

The new act (article 4, section 3) provides that city taxes shall be due and payable on the first Monday in October of each year and shall become delinquent on the 1st day of February, of the year following. The old act provided that taxes should become delinquent on the 31st of December.

Article 4, section 4, of the old act, after authorizing the city to issue bonds, provides that the rate of interest thereon shall not exceed six per cent. The new act omits this limitation as to interest.

Article 4, section 5, of the old act, provides that the board shall not order the payment of any money for any purpose whatever in excess of the amount appropriated for the current year. The corresponding section of the new act states the limitation as follows: "in excess of the total city revenue for the current year."

The same section of the new act contains the following which does not appear in the old:

"All claims against the city shall be voted on separately by ayes and noes, and the same entered on the minutes. Any member of the board voting to allow a claim and issue a warrant therefor, after the total revenues of the city for the current year have been expended, shall be personally liable both to the city and the holder of such warrant for the amount thereof."

Article 4, section 10, of the new act, also contains the following, which is not in the old:

"All warrants issued after the passage of this act shall be listed with the city treasurer in a well-bound book to be kept for that purpose and paid in the order of the priority of their filing. All warrants heretofore issued and now outstanding against the city shall be listed with the treasurer in a well-bound book kept for that purpose and paid out in the order of their filing, only out of a sinking fund of fifteen per cent. of the total revenue of the city, which sinking fund shall be set apart and used alone for this purpose until all the outstanding warrants are paid."

Article 5, section 1, of the new act, contains the following, which does not appear in the old:

"At the first general election held after the passage of this act there shall be elected two school directors who shall hold their offices for three years and until their successors are elected and qualified, and at each succeeding election there shall be elected two school directors to

Erwin v. State.

serve for the term of three years and until their successors are elected and qualified, it being the intention hereof that the old school directors who were elected under the provisions of the act of the general assembly of 1889, c. 235, it being the last charter of the city, of South Pittsburg, shall serve out their respective terms of office for which they were elected."

The new act also provides that in case of a vacancy in the school board, this shall be filled by the remaining members of that board. The old act provides that such a vacancy shall be filled by special election. The new act provides that any one shall be eligible as a member of the school board who has been a bona fide resident of the city for one year. The old act requires two years residence as a qualification.

The new act provides that all persons who own real estate within the city limits, or who are legal voters under the laws of the State and have been continuous *bona fide* residents of the city for six months next before the election shall be qualified voters in any election held in the city for municipal purposes. The old act requires a residence of two years.

It is thus perceived that while the two acts relate to the same territory, and people, and in the main, embrace the same provisions, there are numerous and important differences. It is perceived, too, that the second act contains a full scheme of legislation upon the subject which it covers, and that it was intended to take the place of the prior act. This is equally true whether we deem the

legislature as acting under the belief that chapter 235, p. 510, of the Acts of 1899, the former charter, had been lawfully repealed by chapter 446, p. 1071, Acts 1901, or shall presume that they then knew the law of the subject, and that the act last referred to was void. In either event the legal consequence that in due course follows naturally such facts as above detailed must be permitted to have its ordinary effect.

That consequence is that the subsequent act repealed the prior act (*Terrell* v. *State,* 86 Tenn., 523, 8 S. W., 212; *Cole Mfg. Co.* v. *Falls,* 92 Tenn., 607, 22 S. W., 856; *Chattanooga* v. *Neely,* 97 Tenn., 667, 37 S. W., 558, 34 L. R. A., 442; *Lewis* v. *Mynatt,* 105 Tenn., 508, 58 S. W., 857; *U. S.* v. *Tynen,* 78 U. S., 88, 92, 20 L. Ed., 153; *The Paquette Hahana,* 175 U. S., 685, 20 Sup. Ct., 290, 44 L. Ed., 320; *Murphy* v. *Utter,* 186 U. S., 95, 104, 22 Sup. Ct., 776, 46 L. Ed., 1070; Black on Interpretation of Laws, p. 116), and the new charter displaced the old.

To have this effect, it was not necessary that the people who had been acting under the old charter should affirmatively consent to act under the new, since municipal corporations, in their political aspect, are but arms of the State government, and duties can be imposed upon them, within constitutional limits, at the will of the legislature, and their failure to act cannot change the legal effect of a legislative determination expressed in the form of a law. *Buford* v. *State of Texas,* 72 Tex., 182, 184, 10 S. W., 401; *Blessing* v. *City of Galveston,*

42 Tex., 641, 658, et seq.; *Butner* v. *Boifeuillet,* 100 Ga., 743, 750, 28 S. E., 464.

It is insisted by counsel for plaintiff in error that the result above indicated could not follow, because, under the authorities, a new charter imposed upon a pre-existing corporation but effects, in law, a continuation of the corporation. For support of this proposition we are referred to *Mayor of Colchester* v. *Seaber,* 3 Burrows, 1866; *Milner* v. *Pensacola,* 2 Woods, 632, Fed. Cas. No. 9, 619; *Broughton* v. *Pensacola,* 93 U. S., 266, 23 L. Ed., 896; *O'Connor* v. *Memphis,* 74 Tenn., 730, 735, 736.

We need not discuss these cases separately. The most accurate statement of the doctrine referred to is found in *Mobile* v. *Watson,* 116 U. S., 289, 300, 301, 6 Sup. Ct., 403, 29 L. Ed., 620, wherein it is said:

"When a legislature has given a local community, living within designated boundaries, a municipal organization, and by a subsequent act or series of acts repeals its charter and dissolves the corporation, and incorporates substantially the same people as a municipal body under a new name for the same general purpose, and the great mass of the taxable property of the old corporation used for public purposes is transferred without consideration to the new corporation for the same public uses, the latter, notwithstanding a great reduction of its corporate limits, is the successor in law of the former and liable for its debts; and if any part of the creditors of the old corporation are left without provision for the

paying of their claims they can enforce satisfaction out of the new.

This was approved in the later case of *Shapleigh* v. *San Angelo,* 17 Sup. Ct., 957, 42 L. Ed., 310. In our own case of *O'Connor* v. *Memphis,* supra, after extending discussion, the opinion thus concludes: "All we undertake to decide at present is that the taxing district of Shelby county is so far the successor of the late corporation of the city of Memphis, or the same corporation under a new name, that a suit pending against the old corporation may be revived against the new, and prosecuted to judgment." 74 Tenn., 743.

The accurate view is that stated in the first alternative of the quotation just made, and in the excerpt from *Mobile* v. *Watson,* supra.

That is to say, the last product of legislative action is a new corporation, not a mere continuation of the old, but having taken over the assets of the latter it is made liable for the debts thereof.

This view is in harmony with the dual nature of municipal corporations as they exist in our law, and at once preserves the sovereignty of the States over their governmental instrumentalities, and maintains in full vigor the inestimable constitutional guaranty against the impairment of the obligation of contracts.

"In its governmental or public character," says Dillon, "the corporation is made, by the State, one of its instruments or the local depository of certain limited and prescribed political powers, to be exercised for the public

good on behalf of the State rather than for itself. In this respect it is assimilated, in its nature and functions, to a county corporation, which, as we have seen, is purely part of the governmental machinery of the sovereignty which creates it. Over all its civil, political, or governmental powers, the authority of the legislature is, in the nature of things, supreme, and without limitation, unless the limitation, is found in the constitution of the particular State. But in its proprietary or private character, the theory is that the powers are supposed not to be conferred, primarily or chiefly, from considerations connected with the government of the State at large, but for the private advantage of the compact community which is incorporated as a distinct legal personality or corporate individual; and as to such powers, and to property acquired thereunder, and contracts made in reference thereto, the corporation is to be regarded *quo ad hoc* as a private corporation, or at least not public in the sense that the power of the legislature over it, or the rights presented by it, are omnipotent." Dill., Munic. Corp. (4th Ed.), pp. 107, 108, section 66.

Under the theory that the legislature can abolish and destroy an existing municipal corporation, at will, and erect a new one in its stead, but that the new, on taking over the territory, population, and assets, of the old, becomes liable for its debts, and that the powers originally existing as a means for realizing the debts remain outstanding so far as may be needed for the enforcement of such obligations, but no farther, the power of the State, over its municipal corporations, fails of sovereign com-

pleteness only at the point where it encounters and falls into conflict with the contract clause of the federal or State constitution. And this limitation, it is perceived, is capable of enforcement in such way, and is so enforced, as not to interfere with the complete extinction of a prior corporation, and the erection of another in its stead, by legislative act.

It is a mistake, therefore, to say, that the new corporation is a continuation of the old, if it appear that the legislature intended to abolish the old and erect a new one in its stead.

That intention was manifested in the present instance not only by the fact that the new act purported to be a new and independent charter for South Pittsburg, covering all of the provisions of the old, either by reproducing them without reference or acknowledgment, or by the introduction of clauses diverse thereto, and by the addition of other important provisions, so covering the whole ground of the former act, and more, disclosing a mature scheme of legislation embracing the whole subject, not only in this manner, but the same purpose is manifested in the very language of the act.

In direct terms it disposes of the property "of South Pittsburg as formerly incorporated." Again, in the language above quoted concerning the sale of intoxicating liquors, there is found an unmistakable reference to chapter 221, p. 474, Acts 1899, not by its title or number, but by its substance. The language referred to clearly indicates that the legislature conceived the charter they

were then enacting as creating a new legal entity, which coming into being after the passage of chapter 221, p. 474, Acts 1899, would fall within the scope of that general law which forbade the sale of intoxicating liquors within four miles of any schoolhouse within any incorporated town of not more than 2,000 inhabitants, incorporated after the passage of that act. In the language referred to the present act says: "In the event the inhabitants of the city of South Pittsburg shall at any time be sufficient to justify the sale of intoxicating liquors under the law, then" etc. Again: "Nothing herein shall be construed to authorize the sale of intoxicating liquors so long as the same is prohibited by the general laws of the State."

If it be true, as suggested, that the legislature in using this language was laboring under the erroneous belief that chapter 235, p. 510, of the Acts of 1899, had been repealed by chapter 446, p. 1071, of the Acts of 1901, still the conclusion follows with no less certainty that, it did not, in passing the act now under examination entertain any conception of it as a continuation of the aforesaid chapter 235.

So, if either horn of the dilemma be taken, the intention manifested by the direct language of the act, or the presumed intention arising from the formulation of a complete and independent scheme of legislation, the same conclusion is reached that it was the purpose of the legislature that the new act should supplant the old.

It only remains that we should consider the effect of

Acts 1905, p. 453, c. 220. But little need be said upon this subject. That act, as has been already said, assumed that chapter 235, p. 510, of the Acts of 1899, was still in existence as the charter of South Pittsburg, that chapter 360, p. 810, of the Acts of 1901, was merely an amendment to it, repealed this latter act, and another act, and made certain amendments to the aforesaid revived chapter 235. This legislation could only be effective from the date of its passage. The attempt therein, in substance, to construe the former acts and establish their relations during the former years, was wholly futile, since this was the assumption of a power belonging not to legislative department of the government but only to the judicial.

Speaking from the date of the passage, as it could only do, that act merely gave to South Pittsburg a new charter composed of the resuscitated charter of 1899 (chapter 235, p. 510), and the amendments engrafted upon it therein.

This act being subsequent to chapter 221, p. 474, of the Acts of 1899 (the four-mile law above referred to), and South Pittsburg having a population, indeed less than that number, intoxicating liquors could not be sold therein. The power to regulate the sale of such liquors embraced in the resuscitated act must be construed in the light of the general statute referred to, expressing the policy of the law in respect of this subject for the whole State as affecting corporations of this grade of

Erwin v. State.

population.    So construed that clause must remain in abeyance until the population shall reach the figure fixed by the general law, that is over 2,000.

It results that there was no error in the action of the court below, and the judgments of conviction in all of the cases must be affirmed.