OCEAN BEACH HEIGHTS, Inc., et al. v.
BROWN CRUMMER INV. CO. et al.

No. 8150.

Circuit Court of Appeals, Fifth Circuit.
Jan. 22, 1937.

Rehearing Denied Feb. 5, 1937.

SIBLEY, Circuit Judge, dissenting.

———◆———

J. Julien Southerland, Jno. P. Stokes,
Scott M. Loftin, James E. Calkins, and
Henry K. Gibson, all of Miami, Fla., for
appellants.

Giles J. Patterson, of. Jacksonville, Fla.,
and T. J. Blackwell, and A. Y. Clement,
both of Miami, Fla., for appellees.

Before FOSTER, SIBLEY, · and
HUTCHESON, Circuit Judges.

HUTCHESON, Circuit Judge.

This is another case involving public
obligations in which the difference between
the promise and the ability to pay them is
acutely presented as the result of a claim
of nonliability asserted by territories which,
after the issuance and sale of the bonds,
was excluded from the town of Miami
Shores in ouster proceedings.[1] The suit in
support of a judgment in mandamus pro-
ceedings the bondholders had obtained
against the town, was for injunction to pre-
vent the property owners in the excluded
territory from asserting the ouster judg-
ment against or otherwise interfering with,
tax levies on their property for the bonds.

---

[1] Mahood v. State, 101 Fla. 1254, 133 So. 90.

Appellees prevailed below on the ground that, as to the lands in controversy, the town was a de facto corporation, when the bonds were issued and validated; that the ouster proceedings spoke only for the future; it did not, it could not, affect bondholders who were not parties to it or bonds whose issuance or validity was not the subject of it.

Appellants insist that, whatever might be the effect of the ouster judgment standing alone, it does not stand alone here. It has been supplemented, they say its effect heightened and made completely comprehensive by the later judgment in the equity suit of Leatherman v. Alta Cliff Co., 114 Fla. 305, 153 So. 845, 846, enjoining the issuance of tax deeds to property in the excluded territory. And more in that suit the Supreme Court declared that, as to the territory excluded, the town had never had either de jure or de facto existence. Appellees reply that they were parties to neither of these suits; they are not bound by the judgments in them. They point out that the Leatherman decision was based on the ouster suit. They insist that the expression in the opinion in the Leatherman Case, "The ouster of jurisdiction was necessarily based upon the finding and adjudication that there had never been any authority in law for the inclusion of the territory east of Biscayne Bay within the corporate limits of the town of Miami Shores, and, if there had never been any lawful authority for the inclusion of that territory within the municipality, then the municipality never acquired any de facto or de jure jurisdiction over the lands embraced in that territory," was not necessary to the decision, nor was it correct as a general statement of law. They urge upon us that, in the inquiry of ouster, the only question for decision was de jure existence; it was not, it could not, have been decided in that case whether there was a corporation de facto, for no such question was for decision in it. Appellants' brief is largely taken up with citation and discussion of authority on the point that federal courts will follow the construction the highest court of the state gives to its statutes. They argue that the Supreme Court of the state, having declared that, as to the excluded territory, the town never had either de jure or de facto existence, the federal courts must, in a suit on the bonds, hold that though the bonds were, in fact, issued by the town as obligations on the whole of its territory as its boundaries were originally constituted, they are not obligations in law on the excluded territory. We agree with appellees that the judgment in the ouster suit spoke only as to the future, determined only that from and after the ouster the town did not exist de jure in the excluded territory. We agree with them, too, that, while the judgment in that proceeding prevented the town from imposing any new obligations on and from exercising any further general jurisdiction over it, as a judgment it was without effect upon obligations already fixed and existing against that territory. State ex rel. Fidelity Life Association v. Cedar Keys, 122 Fla. 454, 165 So. 672; State v. Coral Gables, 120 Fla. 492, 163 So. 308, 101 A.L.R. 578; Sparks v. Ewing, 120 Fla. 520, 163 So. 112; City of Winter Park v. Dunblaine, Inc., 121 Fla. 600, 164 So. 366; Payne v. First National Bank (Tex.Com. App.) 291 S.W. 209; Mobile v. Watson, 116 U.S. 289, 6 S.Ct. 398, 29 L.Ed. 620; Shapleigh v. San Angelo, 167 U.S. 646, 17 S.Ct. 957, 42 L.Ed. 310; City of Winter Haven v. Gillespie (C.C.A.) 84 F.(2d) 285. We particularly agree with appellees that it is for this court to determine whether the whole facts in evidence, the acts creating the town, the issuance of the bonds, their validation by court decree under the Florida statute, the conduct of persons in the affected territory, and of the officers of the town toward that territory, support the findings of the court below, that, as to the bonds and the territory in question, a case was made out of a town existing de facto, which was authorized to, and did, issue bonds under circumstances which made them binding obligations on that territory. It is for this court to say whether contrary to the findings of the District Judge, the facts shown of record make out a case of bonds issued in circumstances such that, as to the territory in question, it must be said that it was never even de facto a part of the town, the bonds as to it never had binding force. It is argued by appellants that there is no attack here upon the validity of the bonds, none upon that of the town as a town. The corporation has a de jure existence; the bonds are valid; and the authorities cited above, holding territory which has had a de facto existence as a municipality, to liability for bonds created while it was so acting, have no application here. The bonds in question here, they say, are still obligations of a still existing town. Let the bondholders

look to the town. But this over simple solution, we think, is not either a just or a legal one. By the undisputed evidence it is made to appear that, though the territory from which the corporation was ousted was only a small part of the whole territory of the town, as its bounds were defined in creating it, its value was, and is, greatly in excess of that of all of the other property in the town combined, and that, if it is relieved from liability on the bonds, the remaining territory will not only be wholly inadequate to service them, but such a burden will be thrown upon it as to be intolerable. Under these circumstances, we think the same question is presented as to the liability of territory excluded from a municipality in ouster proceedings as is presented when a municipality is ousted from jurisdiction over all of its territory, is declared nonexistent as to all. If then, it would have been possible in law for the territory in question to have been incorporated into a municipality, and if by compliance with all required forms there was a real appearance, though not the substance, of the fact, that it had actually been so incorporated, we think that, as to bonds issued under the forms of Florida law and validated under the provision of its statutes, the territory, though excluded by the ouster as to the future from the general jurisdiction of the town, remains a part of it for the purpose of servicing and discharging the bonds. Authorities, supra, and City of Decatur v. Thames Bank & Trust Co. (C. C.A.) 84 F.(2d) 105. It is without dispute in the evidence that, from the time of its formation until the ouster proceeding, the town exerted jurisdiction over the whole territory. It levied and collected taxes from it. It was understood by all concerned that it extended over it. It did, in fact, though not in law, so extend. The town was created under the general laws of Florida (Comp.Gen.Laws Fla.1927, § 2935 et seq.). At the time of its organization, by Florida law the jurisdiction of all cities and towns organized under the general law extended to and over the waters of all rivers, creeks, harbors, and bays contained within their corporate limits. Accordingly, when the incorporators set about to create this town they thought they had a right to include, they did include in it, as a part of the corporate area, parts of several bodies of water, the upper reaches of Biscayne Bay and the canal flowing into it, Arch Creek, and

other canals. It is true that practically all of the improvements and nearly all of the population were on the west side of the bay, the land in controversy on the east side. It is true, too, though, that the call for the election was regularly made, the proposed corporate limits as set out in the notice for the election and in the bonds as fixed in forming the town, definitely included that east of the bay. Incorporation was duly voted, the town, with its definitely described limits, was begun, and, from then on, jurisdiction was exercised without discrimination throughout the limits as they had been set out. The bond issues for improvements, a small part of the proceeds of which were spent east of the Bay, were duly authorized, duly validated, duly issued, and duly sold. While it is true that there were only a few persons living on the east side of the Bay, it is true, too, that the property there, ocean front property considered greatly valuable for speculative purposes, was all laid out into lots and blocks, and streets were run through it. The record leaves no doubt, too, that in the halcyon days of 1926 before the golden bubble burst, with the exception of perhaps one of the complainants, every one was well pleased to be a part of the new town, partly because the property thus escaped being taken into the city of Miami and subjected to its greatly heavier taxes, and partly because with a causeway over the Bay under construction, and the boom complex on town lots in control, the inclusion in a town was felt to be a good thing. We do not think, in view of these facts, that it can be said that the town did not have a de facto existence east of the Bay sufficient to support the obligation of the bonds issued on the faith of its existence there as a town.

▮▮ The Supreme Court of Florida correctly held, of course, that the statute under which the town was incorporated was one for self-incorporation and not for the conquest of territory. It was not intended to authorize persons constituting a community to reach out and take into a proposed corporation territory other than that already constituting the hamlet or village to be incorporated. The act, in short, authorized localities having a community status as a village or town to take on corporate status as such. We think it clear then that if, as a matter of fact, as was found in the ouster case, while the property east of the Bay was embraced within the corporate limits, it was not prior to

the incorporation a part of the settlement or community incorporated, it could not by the acts done have been made a part of it de jure. But we are not prepared to hold, we do not hold, that as to persons dealing with the municipality, as it was constituted on paper if not on the ground, and buying its bonds in good faith, the territory in question was not de facto a part of the town. The Supreme Court of Florida has not held in the cases cited that if, as a matter of fact, the territory on both sides of the Bay was a part of the hamlet before it was incorporated, it could not be incorporated as a town. Indeed, in the Mahood Case, it decided the contrary of this. It definitely held that whether the affected territory was ·or was not a part of the town, was to be determined as an issue of fact and not of law. It reversed the judgment of ouster, saying: "We could affirm the judgment of ouster were it not for the fact that the answer alleges, 'It is denied that said territory is not a part of the community of Miami Shores, and that it is far removed and isolated from the community.' This allegation traverses the allegation of the information to the effect that the territory sought to be affected by the information was not a part of the community of Miami Shores. This presents a question of fact·which the respondents are entitled to have tried by a jury, and, until the truth in regard to that fact has been ascertained, it is not needful to discuss other questions raised by the pleadings." 101 Fla. 1254, 133 So. 90, at pages 91, 92.

It pointed out that there was no constitutional inhibition against the town's existence on both sides of the Bay, saying they were not prepared to hold that the Legislature could not have so spread the limits of the town. Finally, it said: "The pleadings all admit that there was a village known as Miami Shores and that the inhabitants of this village proceeded to the organization of a municipal corporation. The question of fact to be determined is whether or not that village had its existence and its location in whole or in part on the lands east of the middle of Biscayne Bay." 101 Fla. 1254, 133 So. 90, at page 92.

It being clear then that the difficulty in the incorporation of the town so as to include the territory in question arises not out of any constitutional prohibition but out of the fact that it was found not to have been a part of the settlement before the town's incorporation, we think it plain that, under the facts as they appear in the record, of a good-faith attempt at incorporation, of user of, and acquiescence in the exercise of corporate power, a de facto corporation was created as to the territory east of the Bay, and that it is bound for the payment of the bonds in question. The decree then was right in enjoining interference with the town authorities in their levying, assessing, and collecting taxes to comply with the judgment which had been entered against them in the mandamus proceeding directing them to do so. It is affirmed.

SIBLEY, Circuit Judge (dissenting).

The decree about to be affirmed is, I think, grossly inequitable in its distribution of the burden of the bonded debt of $238,000. Its effect is to make persons owning the property east of Biscayne Bay and not within the town pay about two-thirds of this debt although the bond money was expended almost wholly for permanent improvements within the town on the west side of the Bay. It is just that the bondholders. have their money; but not just that the most of it should come from property east of the Bay and from persons who were not active in issuing the bonds or misstating the town limits, because the territory and the inhabitants west of the Bay, constituting the real town, got and retained all the benefits but are to pay relatively little.

The evidence is undisputed that in March, 1926, about 2,500 persons lived in a community west of Biscayne Bay to the north of the city of Miami, while three or four miles across the Bay and between ,it and the ocean lay about two square miles of vacant· but valuable land partly plotted into streets and lots but mostly in mangrove swamps, there being thereon but ten dwelling houses, some of them occupied only in winter, and but twelve inhabitants. Under the Florida statute for the self-incorporation of a "hamlet or village," the west-siders called a meeting attended by about 100 persons, of whom 38 were qualified voters, no east-sider appearing to have been present, and the 38 voted into existence a town which should include both the east and the west side territory. A causeway across the Bay was about to be constructed, apparently as a private enterprise, but a hurricane destroyed its beginnings in 1926 and it was never built, so that one on the east side in order to reach the

west side settlement otherwise than by boat must go ten miles. The town officers, always west-siders, in 1927 and 1928 issued the town's bonds, $69,000 expressly for streets and sidewalks, and $169,000 for general purposes, and spent the whole for streets, sidewalks, a town hall, a sewerage system, waterworks, fire wells and garbage trucks, all on the west side save that $6,000 was spent for mosquito eradication on the east side; the greater part of that, however, being an investment in equipment still owned by the town. The town undertook on the east side some garbage removal, some road repair work and some police protection, but afforded neither water nor fire protection, nor sewerage nor lights. Some taxes were paid from the east side, but most of them were defaulted. Some property owners there made no protests against the town's activities, but others did. One large landowner, a defendant here, resisted always and by litigation. In August, 1929, that landowner and three others joined the state of Florida, acting through the Attorney General, in filing a quo warranto against the town. After a decisive opinion from the state Supreme Court, Mahood v. State ex rel. Davis, 101 Fla. 1254, 133 So. 90, that the statute of Florida allowing the self-incorporation of a hamlet or village did not authorize the inclusion of land across miles of navigable water, the town authority was ousted from the east side on December 18, 1931. Several of the property owners, defendants here, obtained under another judgment of the Supreme Court, Leatherman v. Alta Cliff Co., 114 Fla. 305, 153 So. 845, a cancellation of the tax certificates previously issued by the town against their property. The Supreme Court of Florida many years before had construed the statute and held that it did not authorize the inclusion of any but land contiguous to the village or hamlet. Town of Enterprise v. State, 29 Fla. 128, 10 So. 740.

When in 1926 the west-siders undertook what they did both they and the bond-buying public should have known that there was no warrant of law for including the land on the east side of the Bay. Although the bondholder, complainant here, being no party to the above-recited litigations before the Supreme Court of Florida is under no adjudication binding on him, nevertheless the decisions are conclusive in this court on the construction of the Florida statute. In other words, the law in this case is against him.

So are the equities. The bond money produced streets and sidewalks, a town hall, a waterworks, sewerage, and fire protection system wholly on the west side. The mosquito eradication on the east side was probably only a temporary benefit. The lawful town and not the east-siders got the permanent benefit of the whole expenditure. The east-siders may have acquiesced as far as they did because of the general benefit to them of being in the town. The state of Florida by quo warranto excluded them from the town in December, 1931. Since then they could have no police protection or garbage service or street repairs, nor any hope of waterworks, street and sidewalk construction or other town benefits which would have been due them. All consideration for identifying themselves with the town then failed. They got nothing and can get nothing from it. It is not shown that they have estopped themselves to set up their legal rights. Estoppel is personal, not territorial. No east-sider, much less one with which any defendant is shown to be in privity, has been proven to have participated in the false delimitation of the town, or in the issuance, validation or sale of the bonds, or to have said or done anything to mislead the bond buyers. There is indeed no particle of evidence that any bond buyer was ever misled. The bonds have no recital of the town's boundaries in them. The buyers may not have investigated the boundaries at all, or they may have known, as indeed they were bound to know, that the Florida statutes did not allow noncontiguous land to be taken into a self-incorporated town.

If we take the view that the bondholders were not bound thus to know the law, and that all the east side property holders were acquiescent in being in the town and in floating the bonds, nevertheless the state of Florida has put them out. The de facto town has ceased to be. An unexpected situation has arisen. The east side having been divorced from the benefits of the bond expenditures and from all benefit of being in the town, some basis of prorating the indebtedness which takes cognizance of the distribution of the bond benefits would be equitable. I see no fairness in letting this town's officers, in whose selection the east-siders have no voice, value and assess the property of the east side just as though the east side had gotten as many water mains, sewers, streets, and sidewalks, public buildings and vehicles as

the west side has gotten. A practical formula would be to treat the ouster as a separation of two territories, and to value as of that date the permanent bond improvements retained on the west side, and charge that value wholly to the west side; the balance of the bond debt being left as the joint burden of both sides. If on a fair proration taxes would be high on the west-siders, they have no one but themselves to blame. The complaining bondholder should not have the decree he has gotten.

On Petition for Rehearing.

PER CURIAM.

As neither of the judges who concurred in the judgment of the court in the above numbered and entitled cause is of opinion that the petition for rehearing should be granted, it is ordered that the said petition be, and the same hereby is, denied.