## MOBILE v. WATSON.

## SAME v. UNITED STATES, *ex rel.* WATSON.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF ALABAMA.

Argued December 10, 11, 1885.—Decided January 4, 1886.

When a municipal corporation with fixed boundaries is dissolved by law, and a new corporation is created by the legislature for the same general purposes, but with new boundaries, embracing less territory but containing substantially the same population, the great mass of the taxable property, and the corporate property of the old corporation which passes without consideration and for the same uses, the debts of the old corporation fall upon the new corporation as its legal successor ; and powers of taxation to pay them, which it had at the time of their creation and which entered into the contracts, also survive and pass into the new corporation.

The object of the first of these suits was the recovery of a judgment for money, and of the second the enforcement, by the writ of mandamus, of the judgment recovered in the first. They were argued as one case. In the first case Henry Watson, the defendant in error, was the plaintiff in the Circuit Court. He brought his action against the Port of Mobile to recover the principal money due on certain bonds issued by the City of Mobile, under its corporate name, "The Mayor, Aldermen and Common Council of the City of Mobile," and the

interest on the same shown to be due by certain coupons thereto appended. The bonds were issued December 31, 1859, were for $1000 each, and were payable to the order of the Mobile and Great Northern Railroad Company on the first day of January, 1879, with interest at the rate of eight per cent. per annum. Upon the margin of each bond was the following recital: "In pursuance of the terms of the contract between the corporate authorities of the City of Mobile and the Mobile and Great Northern Railroad Company, an ordinance approved on the 30th December instant, provides for the sum of $95,000 by a special tax annually to be applied to the payment of $1,000,000 of bonds to be issued by the City of Mobile to aid in the construction of the Mobile and Great Northern Railroad."

The declaration averred that the defendant, The Port of Mobile, was "the legal successor of the said The Mayor, Aldermen and Common Council of the City of Mobile, and bounden for its debts and for the payment of the said bonds and coupons."

The defendant pleaded "that the said alleged bonds and coupons were issued by the Mayor, Aldermen and Common Council of the City of Mobile, a different municipal corporation, and not by this defendant, nor by any one authorized to bind this defendant in the premises; that this defendant is not the successor in law nor in fact of the said The Mayor, Aldermen and Common Council of the City of Mobile, nor is this defendant legally bounden to pay the said debt."

In the record there was a paper, entitled "Agreement of Facts," signed by the counsel for the parties. By this paper it was admitted that the contract between the City of Mobile and the Mobile and Great Northern Railroad Company, recited in the margin of the bonds, had been made and the ordinance therein referred to had been passed, and that the plaintiff became the legal holder of the bonds and coupons for value before maturity by the assignment of the railroad company. It was further agreed that two acts were passed by the legislature of Alabama on the 11th day of February, A.D. 1879, one entitled "An Act to vacate and annul the charter and dissolve

the corporation of the City of Mobile, and to provide for the application of the assets thereof in discharge of the debts of said corporation," and the other "An Act to incorporate the Port of Mobile and to provide for the government thereof;" said acts were referred to and made part of the agreement. It was further agreed that all the territory now embraced in the Port of Mobile was formerly embraced in the City of Mobile; that the territorial extent of the City of Mobile was about seventeen square miles, and of the Port of Mobile about eight square miles; that the Port of Mobile covered all the thickly settled and closely built portion of the City of Mobile; that the taxable property within the latter, according to the last assessment made by it prior to the passage of the acts of February 11, 1879, was $16,255,093, and that all of said taxable property was embraced within the limits of the Port of Mobile, except about $900,000, and that about fourteen-fifteenths of the resident inhabitants of the City of Mobile were resident inhabitants of the Port of Mobile. It was further admitted that the total indebtedness of the City of Mobile on February 11, 1879, was about $2,500,000, and that it had nominal assets of $775,000, which were largely reduced for the general creditor by prior liens and exemption from levy by execution.

It appeared by the record that the case was submitted to the jury on June 29, 1880, which, on that day, returned a general verdict for the plaintiff, and assessed his damages at $7308.80, upon which the court at once rendered judgment in his favor. A writ of error sued out by the Port of Mobile brought this judgment under review.

The only question raised upon the trial was, whether as matter of law, upon the statutes of the State of Alabama, the Port of Mobile was the legal successor of the City of Mobile, and bound for the payment of the bonds and coupons sued on. The validity of the judgment in the case of The Port of Mobile, plaintiff in error, against Watson, would therefore depend upon the answer to that question.

The plaintiff having obtained his judgment against the Port of Mobile, sued out, May 27, 1881, execution thereon, which, on the same day, was returned by the marshal "no property

found." Afterwards, on the 19th day of January, 1882, he filed in the Circuit Court his petition, in which he prayed for the writ of mandamus, and charged that the Police Board of the Port of Mobile had the right, and it was their duty, to assess and levy a special tax for the satisfaction of his judgment. He therefore prayed for the writ to compel the Port of Mobile and its officers charged with the levying and collection of taxes to assess, levy, and collect a special tax for the payment of his judgment.

In order to understand the questions raised by this petition, it will be necessary to state more fully the contract made by the City of Mobile with the Mobile and Great Northern Railroad Company in reference to the issue of the series of bonds in question, and the legislation of the State of Alabama in reference to the City of Mobile and the Port of Mobile.

By the act of the legislature, approved February 29, 1859, the City of Mobile was authorized to aid the construction of the railroad of said company by an issue to the company of bonds of the city to the amount of $1,000,000, under such contract as the city might make with the railroad company, and was vested with power to adopt the ordinances necessary to carry out such contract. In pursuance of this authority the City of Mobile, on Dec. 30, 1859, entered into a contract with the railroad company, in which, among other things, it was provided that the city should issue to the railroad company, on or before Jan. 2, 1860, its bonds to the amount of $1,000,000, and that the city should annually, after January 1, 1860, provide the sum of $95,000, to be applied to the payment of the bonds and coupons thereto attached as they became due, by a special tax to be levied and collected by the city for that purpose, and that the city should pass the by-laws and ordinances necessary to that end. In pursuance of this contract the City of Mobile, on December 30, 1859, passed an ordinance which provided that for the year 1860, and annually thereafter, there should be levied and collected a special tax upon the assessed value of all the taxable property in the City of Mobile sufficient to produce the said sum of $95,000, and that the money so raised should be pledged to the payment of said bonds and the interest coupons.

Upon the faith of the act of the legislature referred to, and the contract and ordinance of the City of Mobile, bonds of the city to the amount of a million dollars were issued to the railroad company and by it assigned and sold.

The City of Mobile having, in the year 1878, made default in the payment of the interest on its debt, which then exceeded $2,500,000, the legislature, on February 11, 1879, passed " An Act to vacate and annul the charter and dissolve the corporation of the City of Mobile, and to provide for the application of the assets thereof in discharge of the debts of said corporation."

This act, by its first section, repealed the charter of the City of Mobile, and declared that the corporation of the City of Mobile, known as " The Mayor, Aldermen and Common Council of the City of Mobile," was thereby dissolved and abolished.

The act then provided for the appointment by the governor of the State of three commissioners, whose duty it should be to take possession of all the property and assets of the City of Mobile, to hold such property and assets upon the same trusts and subject to the same liens and charges that the same were under when in the possession of the City of Mobile, and, under the direction and pursuant to the orders of the Chancery Court of the County of Mobile, collect the debts and taxes due the city and sell its property and apply the taxes and debts collected and the proceeds of the property sold to the payment of the debts of the city, the floating debt to be first paid. The act declared that the commissioners should have no power to levy any tax or assessment whatever, but that it should be their duty to treat with the holders of the funded debt of the City of Mobile with a view to its adjustment and settlement, and to report to the governor the result of their negotiations, together with the draft of such act as might be proper to carry into effect any scheme of adjustment that might result from such negotiations; all of which it was made the duty of the governor to submit to the legislature.

On the same day; to wit, February 11, 1879, the legislature passed " An Act to incorporate the Port of Mobile, and provide for the government thereof."

This act incorporated, under the name of The Port of Mobile, the inhabitants residing within certain specified boundaries, which included no territory not embraced within the limits prescribed by the charter of the City of Mobile. The act provided for the election of eight persons to be styled the Mobile Police Board, for a tax collector, and other officers, and made it the duty of the tax collector to collect all taxes and license charges, and to perform and discharge all such other duties as might be required of him by the Police Board. It empowered the Police Board to levy and collect, for each year of its existence, upon the assessed value of all property and subjects of State taxation within the Port of Mobile, a tax of six-tenths of one per centum for the purpose of defraying the expenses of carrying out the provisions of the act, and made the assessment returned by the assessor of Mobile County for the preceding year that on which the tax should be levied and collected. The act further provided that the Police Board should have and exercise the powers thereby conferred on them and no other, and repealed all conflicting acts and parts of acts.

After the recovery by the plaintiff of his judgment against the Port of Mobile, on June 29, 1880, the legislature of Alabama, on December 8, 1880, passed an act which declared that the Police Board should not levy any other tax than the six-tenths of one mill on the dollar authorized by the seventeenth section of the act of February 11, 1879, " to incorporate the Port of Mobile and provide for the government thereof," and the license taxes authorized by § 30 of that act.

The legislature, on December 8, 1880, also passed " An Act to adopt and carry into effect the plans for the adjustment and settlement of the existing indebtedness of the late corporation," the city of Mobile, &c. This act was subsequently, on February 24, 1881, reënacted with material amendments.

The amended act provided for an issue of $2,500,000 of the bonds of the City of Mobile, to be dated January 1, 1881, and to be payable in twenty-five years, with interest at three per cent. for five years, four per cent. for fifteen years, and five per cent. for the remaining five years. These bonds were to

be used by exchanging them for the bonds of the City of Mobile of the issue of May 1, 1875, but no available provision was made in the act for the payment or satisfaction of the issue of which the plaintiff's bonds formed a part. The act further required the Commissioners of the City of Mobile, immediately after its passage, to turn over to the Police Board of the Port of Mobile "all the real and personal property which was formerly held and owned" by the city of Mobile "for public use and governmental purposes," such as public buildings, markets, squares, parks, fire-engines, engine-houses, hose and hose carriages, engineering instruments, and all other property of like character and use, except only the wharves.

Such was the legislation of Alabama in reference to the City of Mobile and the Port of Mobile when the plaintiff filed his petition for the writ of mandamus. The defendants to the petition, namely, the Port of Mobile and the Police Board of the Port of Mobile, filed a demurrer and also an answer to the petition. In the latter they denied that the Port of Mobile was the successor of the City of Mobile, bound for its debts and the performance of its duties in reference to said judgment, and denied that the Port of Mobile or its Police Board had any power, or that it was their special duty to assess, levy, or collect the special tax for the purpose of paying said judgment.

The plaintiff demurred to this answer, and upon final hearing upon the demurrer to the petition and the demurrer to the answer, the Circuit Court ordered "that the respondents, the Port of Mobile, the Mobile Police Board, Richard B. Owen, President, James W. Monette, Robert Adams, Sylvester J. Russell, Daniel McNeill, Patrick J. Hanlon, John Henry, Frank P. Andrews, and William Paton, Commissioners of the Port of Mobile and members of said Police Board, do forthwith assess, levy, and cause to be collected a special tax upon the property, real and personal, subject to tax by them, the said Port of Mobile and Mobile Police Board, sufficient to pay and satisfy the said judgment of the relator against the Port of Mobile for the debts of the said relator, with interest thereon, and the same to cause to be collected in lawful money,

and as collected, in whole or in part, the same to pay over, or cause to be paid over, to said Henry Watson, or his lawful attorney, to satisfy the said judgment, with interest thereon."

This judgment also was brought up for review by the writ of error sued out by the Port of Mobile.

*Mr. Hannis Taylor* and *Mr. J. Little Smith* for plaintiff in error. *Mr. Braxton Bragg* was with them on the brief.

There is no contract between the State and the public that the charter of a city shall not be at all times subject to legislative control. All persons who deal with such bodies are conclusively presumed to act upon knowledge of the power of the legislature. There is no such thing as a vested right held by any individual in the grant of legislative power to him. *United States* v. *Railroad Co.*, 17 Wall. 322; *Tippecanoe County* v. *Lucas*, 93 U. S. 108; *People* v. *Morris*, 13 Wend. 325; *Philadelphia* v. *Fox*, 64 Penn. St. 169; *Montpelier* v. *East Montpelier*, 29 Vt. 12. When a legislature confers upon a municipal corporation a new charter with new grants of power, but relating to the same territorial organization and the same population, it merely makes a change in the name, form of government, or powers originally conferred on the old corporation. But when the new grants of power are given to a new corporation by a new name, and with a different territorial organization, they do not revive or reanimate an old corporation, but create a new and distinct corporation in the place of the old one. *Colchester* v. *Seabur*, 3 Bu row, 1866; *The King* v. *Passmore*, 3 T. R. 199, 241; *Scarborough* v. *Butlr*, 3 Lev. 237; *Haddock's Case*, T. Raymond, 435, 439. The ase of *Milner* v. *Pensacola*, 2 Woods, 632, 639, is in entire harmony with these English decisions. So is *Broughton* v. *Pensacola*, 93 U. S. 266. It is true the court speaks of the reorganization of the city of Pensacola as producing a new organization of a municipal corporation which embraces *substantially* the same corporators and the same territory. But in fact, the corporators and the territory were identically the same, both before and after the reorganization, and the court itself put no stress upon the use of the adverb "substantially." What the court

meant was that the mere changes of form and powers, required by the Constitution of 1868 and the act of 1869, were intended to be applied to all existing municipalities for the sake of uniformity, and that the mere repeal of the charters suspended the active operation of the corporations by means of the old instrumentalities, until they complied with said requirements. So that they merely put on new clothes, and in that sense were said to be substantially the same old corporations, dressed up anew, having the same old corporators in new attire. This is the sense also in which this word "substantially" is used in the case of the *City of Olney* v. *Harvey*, 50 Ill. 453, 455, in which the court, in declaring that the original corporation (a town) was not destroyed, and that the city is the same municipality as the town, uses this language: "It has merely changed the machinery of its government and the title of its officers, and is called a city instead of a town. But it is the same municipality. It consists of the same people." So in *Waring* v. *Mobile*, 24 Ala. 701, the territory and inhabitants or their successors were exactly the same after amendment of the charter as before. *Mobile & Spring Hill Railroad* v. *Kennerly*, 74 Ala. 566, did not turn on questions involved in this case.

The constitutional prohibition against the passage of State laws impairing the obligation of contracts extends, as to municipal corporations, only to the particular corporation which owes the obligation, and should not be applied to a new corporation which has contracted no debt, unless it is in doubt what the legislature intended. Courts cannot by construction make the legislature say what it did not intend to say. *Milner* v. *Pensacola*, 2 Woods, 639.

The proposition that any State legislature which declares that it, then and there, absolutely destroys one of the State's municipal corporations, which owes debts at the time, is ineffectual to destroy the corporation and its agencies, unless it retains or provides means and remedies by which the creditor can collect his debt or enforce the fulfilment of the obligation due to him through the courts, is erroneous. This court has held the very reverse of this to be true. *Merriwether* v. *Gar-*

*rett*, 102 U. S. 472, 511, 518, 520; *Wolff* v. *New Orleans*, 103 U. S. 358, 364. Even if it be true that when a legislature confers on a municipal corporation the power to create debts, that this grant of power, alone, by implication, carries with it the authority and duty on the part of that corporation to levy taxes to pay the debt, if the exercise of that authority becomes necessary, and the charter contains no provision in it when the debt is contracted which negatives this implication; yet the proposition does not tend to show that the Port of Mobile is the City of Mobile, which contracted the debt. If it is the same corporation, then there is no need of the implication, because the facts agreed on show that the legislation which authorized the City of Mobile to contract the debt expressly granted power to levy taxes for its payment. So that in no aspect of the case is this principle applicable.

In order to "ascertain whether a charter creates a new corporation or merely continues the existence of an old one, we must look to its terms, and give them a construction consistent with the legislative intent." *Bellows* v. *Hallowell & Augusta Bank*, 2 Mason, 31, 44; *Wyman* v. *Hallowell & Augusta Bank*, 14 Mass. 58, 62; Angell & Ames on Corporations, § 780; Dillon, Municipal Corporations, § 55; Grant on Corporations, 304, 305. A careful examination shows that any legitimate construction of the acts in question must declare that the corporation known as the City of Mobile was abolished and destroyed, and that the Port of Mobile was neither a continuation nor a revivor of that corporation, but was a new and independent corporation not bound for the liabilities of the City of Mobile.

Nor is mandamus the proper or adequate remedy. The Port of Mobile has no power to levy the special tax ordered in this case, or to assess any special tax. The tax machinery which it possesses by law is inadequate, as it has no jurisdiction over the territory of the former city which is excluded from its limits; and the bondholder in this case can never successfully prosecute his remedy in any forum to which tax-payers residing outside of the limits of the Port of Mobile are not amenable. Contribution from them is indispensable.

*Mr. Gaylord B. Clark* and *Mr. James E. Webb* for defendants in error.

Mr. Justice Woods delivered the opinion of the court. After stating the facts in the language reported above, he continued:

It is not disputed that the bonds issued by the City of Mobile upon which the plaintiff brought suit and recovered judgment against the Port of Mobile, were the valid obligations of the City of Mobile, which was bound by its contract to levy and collect annually a tax of $95,000, to be applied to the payment of the principal and interest of the issue of bonds of which those held by the plaintiff formed part. It is apparent from the statement of the case that the act of February 11, 1879, "to vacate and annul the charter of the City of Mobile and provide for the application of the assets thereof in discharge of the debts of said corporation," and the act of the same date, "to incorporate the Port of Mobile and provide for the government thereof," and the several acts subsequent thereto on the same general subject, make no adequate provision for the payment of the bonds held by the plaintiff, and other bonds of the same issue, of which, according to the answer of the Port of Mobile to the petition for the writ of mandamus, there still remain, unsatisfied, bonds to the amount of $323,914. The effect of this legislation is to take from the officers of the City of Mobile all power to lay a tax for their payment, and to leave no means for their satisfaction. The assets of the City of Mobile turned over to the commissioners appointed by authority of the act to vacate its charter being largely reduced for the general creditor by prior liens and exemptions from levy by execution, and their proceeds being first required to be applied to the floating debt of the city, have afforded no satisfaction to the plaintiff, and it is not pretended that payment could or would be made to him out of the proceeds of such assets. If, therefore, the plaintiff cannot exact payment from the Port of Mobile, the effect of the legislation referred to is to deprive him of all remedy upon the bonds issued by the City of Mobile and the contract providing for their payment, valid when

made, and valid still. It is, therefore, a vital question in the case whether the Port of Mobile is the legal successor of the City of Mobile, and bound for its debts. The "agreement of facts" made in the suit upon the bonds is conceded to be a true statement of the facts therein recited. From this paper and other admissions made in the answer of the Port of Mobile to the rule to show cause, and the legislation of the State of Alabama made a part of the record, it appears that on the day when the act was passed vacating and annulling the charter, and dissolving the corporation of the City of Mobile, another act was passed to incorporate the Port of Mobile; that all the territory embraced within the limits of the Port of Mobile was formed of part of the territory, and included all the thickly settled and closely built portion of the City of Mobile; that out of more than $16,000,000 of taxable property of the City of Mobile, all but $900,000 was included within the limits of the Port of Mobile; and that fourteenth-fifteenths of the inhabitants of the City of Mobile were inhabitants of the Port of Mobile. While, therefore, the area of territory of the Port of Mobile was little more than half-that of the City of Mobile, it is apparent that the former included substantially the same taxable property, and the same body of people, as the City of Mobile. It further appears that all the property, except its wharves, of the City of Mobile, used by it for public and governmental purposes, was by the authority of the act of February 24, 1881, turned over and delivered to the Port of Mobile for its use without compensation to be paid therefor.

We are of opinion upon this state of the statutes and facts, that the Port of Mobile is the legal successor of the City of Mobile, and liable for its debts. The two corporations were composed of substantially the same community, included within their limits substantially the same taxable property, and were organized for the same general purposes.

Where the legislature of a State has given a local community, living within designated boundaries, a municipal organization, and by a subsequent act or series of acts repeals its charter and dissolves the corporation, and incorporates substantially the same people as a municipal body under a new name for

the same general purpose, and the great mass of the taxable property of the old corporation is included within the limits of the new, and the property of the old corporation used for public purposes is transferred without consideration to the new corporation for the same public uses, the latter, notwithstanding a great reduction of its corporate limits, is the successor in law of the former, and liable for its debts; and if any part of the creditors of the old corporation are left without provision for the payment of their claims, they can enforce satisfaction out of the new. In illustration and support of this proposition, the following cases are in point:

In *Girard* v. *Philadelphia*, 7 Wall. 1, it was held by this court that the annexation to the city of Philadelphia, having a territory of only two square miles, of twenty-eight other municipalities with all their inhabitants, comprising districts, boroughs, and townships of various territorial extent, and the changing of its name, did not destroy its identity or impair its right to hold property devised to it.

So in *Broughton* v. *Pensacola*, 93 U. S. 266, 270, it was said by Mr. Justice Field, in delivering judgment, that when "a new form is given to an old corporation, or such a corporation is reorganized under a new charter, taking in its new organization the place of the old one, embracing substantially the same corporators and the same territory, it will be presumed that the legislature intended a continued existence of the same corporation, although different powers are possessed under the new charter and different officers administer its affairs, and in the absence of express provision for their payment otherwise, it will also be presumed in such case that the legislature intended that the liabilities as well as the rights of property of of the corporation in its old form should accompany the corporation in its reorganization."

In *O'Connor* v. *Memphis*, 6 Lea, 730, the Supreme Court of Tennessee went so far as to say that—" Neither the repeal of the charter of a municipal corporation, nor a change of its name, nor an increase or diminution of its territory or population, nor a change in its mode of government, nor all of these combined, will destroy the identity, continuity, or succession

of the corporation if the people and territory reincorporated constitute an integral part of the corporation abolished . . . The corporators and the territory are the essential constituents of the corporation, and rights and liabilities · naturally adhere to them."

In *Mount Pleasant* v. *Beckwith*, 100 U. S. 514, a municipal corporation had been dissolved and its territory divided between and annexed to three adjacent corporations. Upon this state of facts the court held that, unless the legislature otherwise provided, the corporations to which the territory and the inhabitants of the divided corporation had been transferred, were severally liable for their proportionate share of its debts, · and were vested with its power to raise revenue wherewith to pay them by levying taxes upon the property transferred ·and the persons residing therein. See also *Colchester* v. *Seaber*, 3 Burrow, 1866 ; *Cuddon* v. *Eastwick*, 1 Salk. 192 ; *People* v. *Morris*, 13 Wend. 325 ; *New Orleans Railroad Co.* v. *City of New Orleans*, 26 La. Ann. 478.

In the case of *Amy* v. *Selma*, recently decided by the Supreme Court of Alabama, and not yet reported, a question almost identical with the one now in hand was considered. The legislature of Alabama had passed an act, approved December 11, 1882, entitled "An Act to vacate and annul the charter and dissolve the corporation of the City of Selma, and to provide for the application of the assets thereof ·to the payment of the debts thereof." That act repealed the charter of the City of Selma and all acts amendatory thereof, and declared the corporation dissolved, and all offices held under any of said acts, except for the purposes and during the period provided by the repealing act, abolished, and that all powers of taxation given to the City of Selma by acts of the legislature were resumed by and lodged in the legislature. It transferred to the custody and control of the State of Alabama all property, real and personal, held and used by the corporation for governmental or other public purposes, and declared that the inhabitants and territory within the territorial limits and jurisdiction of said corporation were resolved into the body of the State. The residue of the act was substantially similar to the

act of February 11, 1879, "to vacate and annul the charter and dissolve the corporation of the City of Mobile," etc.

This was followed by an act approved February 17, 1883, "to incorporate the inhabitants and territory formerly embraced within the corporate limits of the municipal corporation, since dissolved, styled the City of Selma, and to establish a local government therefor."

This act, after reciting the dissolution of the City of Selma and the repeal of its charter, among many other provisions, formed the inhabitants residing within the territory formerly covered by the City of Selma into a municipal corporation under the name and style of "Selma;" provided for officers of the municipality and prescribed their duties; authorized them to levy taxes, but declared that no funds derived by the corporation thereby created from taxes or any other source should be used for the payment of any of the debts of the City of Selma, and transferred and made over to Selma the property which had been held and used by the City of Selma, to be held and used for the same uses and trusts to which it had been devoted while in the possession of the City of Selma.

This act was followed by an act approved February 19, 1883, to carry into effect any plan or scheme for the compromise, adjustment, and settlement of the existing indebtedness of the late corporation, known as the City of Selma, which might be be agreed upon between the creditors of the said City of Selma and commissioners appointed under and by virtue of the act . . . of December 11, 1882. With this series of acts in force the Supreme Court of Alabama, in the case mentioned, was called on to construe the act "to vacate and annul the charter and dissolve the corporation of the City of Selma, and to provide for the application of the assets thereof to the payment of the debts thereof." It held that this act was without operation upon the debts and liabilities of the City of Selma lawfully contracted; that the act of February 19, 1883, to incorporate the inhabitants and territory formerly embraced within the limits of the City of Selma was a reorganization, under the corporate name of Selma, of the same corporators, and embraced substantially the same territory as the City of

Selma; that the corporation called Selma was the successor of the City of Selma, and bound for the payment of its debts; and that a suit at law, founded on a judgment against the City of Selma, was maintainable against its successor, Selma.

This construction of these statutes of the State of Alabama by its highest court being in accord with our own views, and in harmony with former decisions of this court on the same general subject, is decisive of the question in hand, unless there is some material difference between the legislation concerning the City of Selma and that concerning the City of Mobile. The only difference that can be supposed to have any bearing upon the question under discussion is, that the act incorporating Selma embraced the same territory as that covered by the City of Selma, whereas the Port of Mobile covered little more than half the territory embraced by the City of Mobile. We think this difference between the two cases is an immaterial one. The Supreme Court of Alabama, in the case of the *Mobile and Spring Hill Railroad Co.* v. *Kennerly*, 74 Ala. 566, assumed that the City of Mobile and the Port of Mobile had substantially the same corporators and the same boundaries. And we are of opinion that the exclusion from the limits of the Port of Mobile of the sparsely settled suburbs of the City of Mobile, a territory of little value, as fairly appears by the record, and consisting, as stated by the counsel for plaintiff, without contradiction, largely of fields, swamps and land covered with water, will not serve to distinguish this case from the case of *Amy* v. *Selma*. We repeat, therefore, that in our judgment the Port of Mobile is the legal successor of the City of Mobile, and bound for its debts.

It follows from this proposition that the remedies necessary to the collection of his debt, which the law gave the creditor of the City of Mobile, remain in force against the Port of Mobile. The laws which establish local municipal corporations cannot be altered or repealed so as to invade the constitutional rights of creditors. So far as such corporations are invested with subordinate legislative powers for local purposes, they are the mere instrumentalities of the States, for the convenient administration of their affairs, and are subject to legislative

control.  But when empowered to take stock in or otherwise aid a railroad company, and they issue their bonds in payment of the stock taken, or to carry out any other authorized contract in aid of the railroad company, they are to that extent to be deemed private corporations, and their obligations are secured by all the guarantees which protect the engagements of private individuals.  *Broughton* v. *Pensacola,* 93 U. S. 266 ; *Mount Pleasant* v. *Beckwith,* 100 U. S. 514.

Therefore the remedies for the enforcement of such obligations assumed by a municipal corporation, which existed when the contract was made, must be left unimpaired by the legislature, or, if they are changed, a substantial equivalent must be provided.  Where the resource for the payment of the bonds of a municipal corporation is the power of taxation existing when the bonds were issued, any law which withdraws or limits the taxing power and leaves no adequate means for the payment of the bonds is forbidden by the Constitution of the United States, and is null and void.  *Von Hoffman* v. *Quincy,* 4 Wall. 535 ; *Edwards* v. *Kearzey,* 96 U. S. 595 ; *Ralls County Court* v. *United States,* 105 U. S. 733 ; *Louisiana* v. *Pillsbury,* 105 U. S. 278 ; *Louisiana* v. *Mayor of New Orleans,* 109 U. S. 285.  These propositions receive strong support from the decisions of the Supreme Court of Alabama.  *Commissioners of Limestone County* v. *Rather,* 48 Ala. 433 ; *Edwards* v. *Williamson,* 70 Ala. 145 ; *Slaughter* v. *Mobile County,* 73 Ala. 134.

It follows that the contract by which, under authority of the legislature, the City of Mobile agreed to levy a special tax for the payment of the principal and interest of the class of bonds to which those held by the plaintiff belong is still in force, and its obligation rests upon its legal successor, the Port of Mobile.

All laws passed since the making of the contract, whose purpose or effect is to take from the City of Mobile, or its successor, the power to levy the tax and pay the bonds, are invalid and ineffectual, and will be disregarded.  Mr. Justice Field, when delivering the judgment of this court in *Wolff* v. *New Orleans,* 103 U. S. 358, 368, said : " The courts, therefore, treating as invalid and void the legislation abrogating or

restricting the power of taxation delegated to the municipality, upon the faith of which contracts were made with her and upon the continuance of which alone they can be enforced, can proceed, and by mandamus compel, at the instance of the parties interested, the exercise of that power, as if no such legislation had ever been attempted." And so in *Ralls County Court* v. *United States*, 105 U. S. 733, 738, it was said by the Chief Justice, speaking for the court, that "all laws of the State which have been passed since the bonds in question were issued, purporting to take away from the county courts the power to levy taxes necessary to meet the payments, are invalid, and, under the well settled rule of decision in this court, the Circuit Court had authority, by mandamus, to require the County Court to do all the law, when the bonds were issued, required it to do to raise the means to pay the judgment, or something substantially equivalent."

The Port of Mobile has the machinery and officers requisite for the assessment of property and for the levy and collection of taxes to carry on the city government. There is no reason why the taxes necessary to pay the judgment of the plaintiff cannot be levied and collected by the same officers. There is no obstacle to the full and complete performance by the Port of Mobile and the Mobile Police Board of the duties required by the peremptory writ of mandamus issued by the Circuit Court.

It follows from the views we have expressed that the judgment of the Circuit Court in favor of the plaintiff for $7308.80 and costs against the Port of Mobile, and the judgment directing the peremptory writ of mandamus to be issued against the Port of Mobile and the Mobile Police Board for the satisfaction of such judgment, are both warranted by law.

*Judgments affirmed.*