******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

SINGLE SOURCE, INC. *v.* CENTRAL REGIONAL
TOURISM DISTRICT, INC.
(SC 18819)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald and Espinosa, Js.

*Argued September 19, 2013—officially released July 8, 2014*

*Andrew D. Epstein*, pro hac vice, with whom were *Proloy K. Das* and, on the brief, *Bernard F. Gaffney*, for the appellant (plaintiff).

*Lawrence G. Rosenthal*, with whom, on the brief, was *Fletcher C. Thomson*, for the appellee (defendant).

*Opinion*

McDONALD, J. In 2003, our legislature repealed statutory provisions that had established eleven districts statewide for the promotion of tourism (local districts) and enacted legislation establishing five larger districts (regional districts) serving that same purpose. This case, which comes to us by way of certification from the United States District Court for the District of Massachusetts, raises questions regarding the satisfaction of contingent liabilities of the legislatively dissolved local districts.

The plaintiff, Single Source, Inc., a Massachusetts corporation, commenced an action in the District Court against one of the regional districts, the defendant, Central Regional Tourism District, Inc., seeking to hold the defendant liable for damages under a contract that the plaintiff had executed with one of the local districts, the Greater Hartford Tourism District, Inc. (Greater Hartford). The defendant thereafter moved for summary judgment on the grounds that: (1) it is not the legal successor to Greater Hartford, and, therefore, cannot be held liable for the contractual obligations assumed by that entity; and (2) even if it is Greater Hartford's successor in interest, General Statutes § 10-397a provides it with an absolute defense because the acts necessary under § 10-397a (d) to assume such an obligation were not undertaken.[1]

The District Court, in its memorandum of decision on the motion for summary judgment, concluded that, because it could find no statute extending the life of the local districts after they were legislatively dissolved for purposes of litigating or settling claims against them, the plaintiff could not have brought a breach of contract action against Greater Hartford. Therefore, the court concluded that the question was whether the defendant had succeeded to Greater Hartford's liabilities.[2] Ultimately, the court concluded that the absence of state court authority and the possibility that § 10-397a could provide a defense to liability that could result in an unconstitutional impairment of contractual obligations counseled in favor of certifying questions of state law to this court.[3] The District Court thereafter certified three questions to this court pursuant to General Statutes § 51-199b. This court accepted, after making certain modifications, the following questions: "1. Is the [defendant] the legal successor to [Greater Hartford]?"; "2. If the answer to the first question is yes, does . . . § 10-397a afford the [defendant] a total or partial defense to the contractual obligations of [Greater Hartford]?" and "3. If the answer to the first question is no, what entity, if any, is responsible for those obligations?"

We answer the first certified question in the negative. Therefore, we need not answer the second question, although we note that § 10-397a bears significantly on

our resolution of the first question. We answer the third question as follows: If Greater Hartford has transferred any of its assets to another entity and the plaintiff can establish that the assets were fraudulently conveyed, that entity may be responsible for Greater Harford's obligations to the extent of the value of the assets received.

Although not directly relevant to our resolution of the legal questions presented here, the following facts, as found by the District Court, and the procedural history of this case provide useful context for the legal landscape in which these questions arise. From 1996 to 2001, the plaintiff, a supplier of professional photography and related services, and Greater Hartford executed a series of contracts that, in essence, granted Greater Hartford a license to use certain photographic images owned by the plaintiff. The contractual relationship between the parties ended on August 15, 2003.

In September, 2008, the plaintiff commenced a breach of contract action against the defendant, identifying it in the complaint as a corporation "formerly known as Greater Hartford . . . ." Accordingly, in its complaint, the plaintiff referred to both entities as the defendant. In its complaint, the plaintiff asserted three claims, seeking $237,000 for 159 allegedly unreturned photographs, $443,975 in late fees for 1505 photographs allegedly untimely returned by the defendant in October, 2004, and unspecified user fees for the defendant's alleged unauthorized use of nine photographic images in or around 2005. In its answer, the defendant denied most of the plaintiff's allegations and asserted as affirmative defenses that: (1) the plaintiff had brought the action against the wrong party; and (2) pursuant to § 10-397a, the defendant did not assume the liabilities of Greater Hartford. Thereafter, the defendant moved for summary judgment on the basis of its affirmative defenses.

In connection with that motion, the parties disputed when Greater Hartford ceased to exist and when the defendant became operational. The defendant submitted evidence indicating that it had commenced operation on August 20, 2003, the effective date of the Public Act in which the legislature had dissolved the local districts and established the regional districts. See Public Acts, Spec. Sess., June, 2003, No. 03-6, §§ 210 through 217, 248 (Spec. Sess. P.A. 03-6). In its memorandum of law, however, the defendant contended that it had commenced operation on June 3, 2004, the effective date of the 2004 Public Act in which the legislature enacted the provision on which the defendant relied in its affirmative defense. See Public Acts 2004, No. 04-205, § 3 (P.A. 04-205). The plaintiff proffered the only evidence independent of the effective dates of these two Public Acts: a payment from Greater Hartford to the plaintiff dated November 17, 2003, and a filing with

the Secretary of the State on December 15, 2003, in which Greater Hartford's name had been changed to the defendant's name in the commercial recording division.[4] There was no dispute, however, that, by the time of the hearing on the motion for summary judgment, Greater Hartford was " 'in dissolution and out of business.' "[5]

The District Court noted the following facts that, in its view, weighed in favor of a conclusion that the defendant is the successor in interest to Greater Hartford. The defendant serves substantially the same geographic area and population that Greater Hartford formerly served. By statute, Greater Hartford could transfer most of its cash assets and any of its noncash assets to the defendant. The court also noted that, in addition to the name change filed with the Secretary of the State, the plaintiff proffered "functional evidence supporting the inference that [the defendant] is [Greater Hartford's] legal successor": (1) the defendant is located in the same office in which Greater Hartford previously was located; (2) the defendant uses the same telephone and fax numbers that Greater Hartford had used; and (3) the defendant derived a benefit from Greater Hartford's contract by using the plaintiff's photographs in its promotional materials. The District Court also found, however, that the defendant had not taken the statutorily mandated steps necessary to assume a former district's liabilities under § 10-397a.

With this factual background as context, we turn to the question of whether the defendant is Greater Hartford's legal successor. The threshold determination that must be made is what law governs the resolution of this question. Because the tourism districts are strictly creatures of statute, undoubtedly the statutory scheme must be the source of first resort. As such, we are guided by our well established rules of statutory construction to ascertain the intent of our legislature. See *Hartford/Windsor Healthcare Properties, LLC* v. *Hartford*, 298 Conn. 191, 197–98, 3 A.3d 56 (2010) (explaining plain meaning rule under General Statutes § 1-2z and setting forth process for ascertaining legislative intent). Accordingly, although the certified questions are framed solely with reference to the particular entities implicated in the present case, the issue of legislative intent requires us to construe the scheme in a manner applicable to all of the districts.

We begin with a brief historical overview of the statutory scheme before turning to our analysis of the specific provisions that, in our view, yield a conclusive answer to the question of a successor relationship between the local and regional districts. Since the mid-1970s, the state has provided funding at the municipal or regional level for the purpose of promoting tourism, a goal that also was supported through funding from the private sector. See Public Acts 1974, No. 74-337;

Conn. Joint Standing Committee Hearings, Commerce and Exportation, Pt. 1, 1992 Sess., p. 34, remarks of Representative Robert A. Maddox, Jr. Initially, the legislature made state funds available to municipalities on an elective basis and subject to certain conditions. See General Statutes (Rev. to 1975) §§ 7-136a, 7-136b and 7-136c. In 1981, the legislature expanded the scheme to allow municipalities to obtain such funds collectively as districts if they previously had formed districts to perform other municipal functions. See Public Acts 1981, No. 81-417.

In 1992, the legislature abolished that elective scheme in favor of one that would provide more equitable funding to all municipalities, shift some funding to promote Connecticut as a state tourism destination, and provide greater accountability for the use of state funds. See Public Acts 1992, No. 92-184; see also Conn. Joint Standing Committee Hearings, supra, pp. 4–5, 7–10, remarks of Joseph J. McGee, Commissioner of Economic Development. To accomplish these goals, the legislature created a two tier scheme: eleven local tourism districts comprised of every municipality in the state, and an Office of Tourism and a Connecticut Tourism Council reporting to the Department of Economic Development to oversee the local districts and address statewide issues. See General Statutes (Rev. to 1993) §§ 32-300 through 32-305. Greater Hartford was one of these local districts. General Statutes (Rev. to 1993) § 32-302 (a) (8).

In 2003, the legislature repealed the provisions establishing the eleven local districts and enacted provisions establishing five larger regional districts, effective August 20, 2003. See Spec. Sess. P.A. 03-6. The 2003 Public Act reassigned every municipality to a regional district. See Spec. Sess. P.A. 03-6, § 215; see also General Statutes (Rev. to 2005) § 10-397 (a). In some cases, all of the municipalities formerly assigned to one local district were assigned to the same regional district. In others, the municipalities were disbursed among two or three regional districts. In the case of Greater Hartford, all but one town that previously had been assigned to it was assigned to the central regional district, later incorporated as the defendant.[6] Municipalities from three other local districts also were assigned in whole or in part to the central regional district.

In addition to the 2003 Public Act, which legislatively dissolved the local districts and created the regional districts, two subsequent public acts have particular significance in the present case. In 2004, the legislature enacted a provision, codified as § 10-397a, that addressed the transfer of assets and liabilities from local districts to regional districts. See P.A. 04-205, § 3. In 2009, the legislature consolidated the five regional districts into three regions (consolidated districts), one of which remained the central regional district.[7] See

Public Acts, Spec. Sess., September, 2009, No. 09-7, § 12 (Spec. Sess. P.A. 09-7).

In considering the question of succession, the enactment of § 10-397a[8] in 2004, and subsequent amendments to this provision in 2009, are key. See P.A. 04-205; Spec. Sess. P.A. 09-7, § 14. The provision as originally enacted addressed the assets and liabilities of a "[f]ormer tourism district," defined in subsection (a) (3) to indicate the eleven local districts dissolved under Spec. Sess. P.A. 03-6. See General Statutes (Rev. to 2005) § 10-397a (a) (3). Subsection (b) set forth conditions under which a former tourism district could distribute its cash assets to one or more of the five regional districts. Subsection (c) set forth conditions for a former tourism district's transfer of its noncash assets to one or more of the regional districts. Subsection (d) addressed the conditions under which a regional district could assume the liabilities of a former tourism district.

Specifically, P.A. 04-205, §3, which originally enacted § 10-397a, provided in relevant part: "(b) Any former tourism district having a cash surplus, after accounting for all liabilities, may distribute such surplus to the regional tourism district or districts serving the towns formerly served by such district. Any distribution shall be divided among the new district or districts in accordance with the following schedule . . . .

"(c) Any former tourism district may, with the approval of the executive director, transfer noncash assets, including fixed assets and leases, to a regional tourism district or districts serving the towns formerly served by such district.

"(d) Any regional tourism district may, by vote of its board of directors and with the approval of the commission, assume the liabilities of a former tourism district that served all or part of the area served by the new district. No such assumption shall be approved unless (1) the regional district's approved budget makes provision for the costs arising from the assumption of liability; and (2) the commission finds that the proposed assumption of liability is fair and equitable." See also General Statutes (Rev. to 2005) § 10-397a.

Several inferences arise from the text of this provision that indicate that the legislature did not intend to create a legal successor relationship between the local and regional districts. First, if the regional districts had become the successors to the local districts by operation of law when the local districts were legislatively dissolved effective August 20, 2003, it would have served no purpose for the legislature to enact § 10-397a in 2004. Second, the legislature made the transfer of assets and assumption of liabilities discretionary, but mandated the satisfaction of certain conditions if a regional district elected to assume such liabilities. Third, the transfer of assets is at the election of the

former local district, whereas the assumption of liabilities is at the election of the regional district. Fourth, the legislature did not require regional districts, should they chose to assume liabilities, to do so in proportion to the common geographic coverage or population of the local district subject to the liabilities. Finally, by imposing a requirement that local districts account for liabilities before distributing cash assets, more than nine months after the legislature dissolved the local districts, the legislature indicated that local districts still could be in existence, even if not in operation, for winding down purposes after the establishment of the regional districts.[9] Indeed, the payment from Greater Hartford to the plaintiff dated November 17, 2003, is consistent with winding up that local district's business.

We do not ascribe significant weight to the fact that, in § 10-397a, the legislature limited the transfer of assets and liabilities between districts serving all or part of the same geographic area. Nor do we ascribe significant weight to the fact that it prescribed a schedule for any transfer of surplus cash assets that roughly corresponded with the percentage of towns in the local district that were assigned to the regional district. See footnote 8 of this opinion. Although these provisions could be construed to suggest some relationship between the districts serving the same areas, there also is evidence that the legislature intended to maintain general parity in funding for the districts. See Conn. Joint Standing Committee Hearings, supra, p. 12, remarks of Commissioner McGee; id., p. 18, remarks of Representative Alex A. Knopp; Spec. Sess. P.A. 03-6, § 215; Public Acts 2011, No. 11-48, § 102 (P.A. 11-48). The aforementioned constraints are fully consistent with achieving that goal.

Indeed, the legislature's intention not to make the regional districts the legal successors to the local districts is bolstered by the 2009 amendments to § 10-397a. As we previously have indicated, it is at this time that the legislature consolidated the five regional districts into three districts. Spec. Sess. P.A. 09-7, § 12. At that same time, the legislature changed the references to the five regional districts in § 10-397a to the three consolidated districts, but maintained all of the references to the "former" local districts. See Spec. Sess. P.A. 09-7, § 14. In other words, subject to the same conditions as previously existed, the local districts were authorized to distribute cash surplus and transfer noncash assets to the consolidated districts, while the consolidated districts were authorized to assume the liabilities of the local districts. The 2009 Public Act also modified the schedule for distribution of the local districts' transfer of cash surplus remaining "after accounting for all liabilities" to roughly correspond with the percentage of towns in the local district that were assigned to the consolidated districts.[10] Spec. Sess. P.A. 09-7, § 14. These changes indicate that the local districts, although dissolved since 2003, still could be in possession of

assets and subject to liabilities as of 2009. By maintaining the requirement that an accounting of liabilities must take place before cash assets could be distributed, the legislature implicitly extended the winding up period. In so doing, it does not seem to be a mere coincidence that the legislature would have accounted for the local districts' potential exposure to liability for claims advanced within the six year statute of limitations for contract actions.[11] See General Statutes § 52-576; see also *Campisano* v. *Nardi*, 212 Conn. 282, 290, 562 A.2d 1 (1989) ("this court has previously refrained from imposing a strict time limit on the completion of winding up activities").

We also note that the legislature's provision in 2009 for the transfer of assets and liabilities from the local districts to the consolidated districts; Spec. Sess. P.A. 09-7; stands in stark contrast to the omission of a similar provision for such transfers from the five regional districts to the three consolidated districts. That the legislature did not so provide suggests that the three consolidated districts became the legal successors to the five regional districts by operation of law. Conversely, the transfer scheme provided for the local districts indicates that they had no successors by operation of law.

There also are indications in the public acts that predate the adoption of § 10-397a that lend support to our conclusion. At the same time that the legislature dissolved the local districts and created the regional districts, it expressly designated one entity in the tourism scheme as a "successor" to other entities and authorized the transfer of the predecessor's functions and appropriations to that successor. See Spec. Sess. P.A. 03-6, § 210 (d) (enacting provision, later codified at General Statutes [Rev. to 2005] § 10-392 [d], which provided: "[t]he Connecticut Commission on Arts, Tourism, Culture, History and Film shall be a successor department to [inter alia] the Office of Tourism [and] the Connecticut Tourism Council . . . in accordance with the provisions of sections 4-38d and 4-39 of the general statutes"); see also P.A. 11-48, § 98 (d) (amending General Statutes [Rev. to 2011] § 10-392 [d] to designate Department of Economic and Community Development as "a successor agency to [inter alia] the Connecticut Commission on Culture and Tourism[12] . . . in accordance with the provisions of sections 4-38d and 4-39").[13] In addition to the fact that the legislature made no such designation with respect to the regional districts, the legislature did not simply transfer the existing rights and duties of the local districts to the regional districts. Rather, it made several substantive changes to the scheme governing the regional districts, some of which shifted greater power to state controlled oversight entities. In particular, whereas the local districts were required to submit their budgets to the Connecticut Tourism Council for review only, the regional

districts were required to obtain approval of their budgets from the Connecticut Commission on Culture and Tourism. Compare General Statutes (Rev. to 2003) §§ 32-301 (b) (9) and 32-302 (e), with General Statutes (Rev. to 2005) § 10-394 (a). If the commission disapproved a regional district's budget, the commission would adopt an interim budget that would serve as the regional district's budget until the district had submitted a budget that met with the commission's approval. General Statutes (Rev. to 2005) § 10-394 (a). Finally, when the legislature dissolved the local districts, it did not simply consolidate or merge the local districts to create the regional districts, as it did with the consolidated districts in 2009. Rather, as we previously indicated, municipalities comprising local districts were, in some cases, broadly disbursed into two or three regional districts. Compare Office of Legislative Research, Bill Analysis, House Bill No. 6806, "An Act concerning General Budget and Revenue Implementation Provisions," (2003), §§ 210 through 239, 241-Tourism, available at http://www.cga.ct.gov/2003/ba/2003HB-06806-R00SS2-BA.htm (last visited June 23, 2014), with Office of Legislative Research, Bill Analysis, House Bill No. 7007, "An Act Implementing the Provisions of the Budget concerning General Government and Making Changes to Various Programs," (2009), §§ 12 through 14, available at http://www.cga.ct.gov/2009/BA/2009HB-07007-R00SS3-BA.htm (last visited June 23, 2014).

Therefore, we find abundant, clear evidence in the statutory scheme that the legislature did not intend to make the regional districts the legal successors to the local districts. Instead, it plainly allowed the regional districts to choose whether to assume obligations of the local districts. In light of this conclusion, we need not consider whether this court would adopt the common-law rules of municipal succession cited by the District Court to resolve an ambiguity in the scheme.[14] Therefore, we answer "no" to the first certified question asking whether the defendant is the legal successor to Greater Hartford.

In light of this conclusion, we do not answer the second certified question. Instead, we turn to the third certified question, which asks what entity, if any, is responsible for Greater Hartford's obligations. We note that this question presupposes that Greater Hartford would not have been responsible for its own liabilities, based on the District Court's view that no statute extended the life of the local districts after their dissolution. As we previously have explained, however, the statutory scheme authorizes a winding up period to allow local districts to account for liabilities. Implicit in such authority is the ability to settle or otherwise be subject to litigation to resolve outstanding obligations. Cf. General Statutes § 33-884 (a) ("[a] dissolved corporation continues its corporate existence but may not carry on any business except that appropriate to wind

up and liquidate its business and affairs, including: [1] [c]ollecting its assets; [2] disposing of its properties that will not be distributed in kind to its shareholders; [3] discharging or making provision for discharging its liabilities; [4] distributing its remaining property among its shareholders according to their interests; and [5] doing every other act necessary to wind up and liquidate its business and affairs"); General Statutes § 33-891 (a) ("[a] corporation administratively dissolved continues its corporate existence but may not carry on any business except that necessary to wind up and liquidate its business and affairs under section 33-884 and notify claimants under sections 33-886 and 33-887"). Nonetheless, we note that, even if Greater Hartford was still winding up district business when the plaintiff commenced the present action, a matter on which no evidence was presented by the parties, it would appear that any claim against Greater Hartford would now be barred by the six year statute of limitations on contract actions. See General Statutes § 52-576.

If, however, Greater Hartford transferred any of its assets to the defendant and thereby rendered itself unable to pay an existing debt to the plaintiff, then the plaintiff could be entitled to hold the defendant responsible for Greater Hartford's obligations. As we previously have noted, Greater Hartford was statutorily required to account for its liabilities before distributing its cash assets. Under the rules applicable to fraudulent conveyances, a recipient of assets that were transferred by the debtor before the creditor had been satisfied would have to disgorge those assets. See *State* v. *Goggin*, 208 Conn. 606, 619, 546 A.2d 250 (1988) ("[a] fraudulent conveyance . . . is one made without substantial consideration and which renders the [transferor] unable to meet his obligation or one made with a fraudulent intent in which the [transferee] participated" [internal quotation marks omitted]); *Molitor* v. *Molitor*, 184 Conn. 530, 535–36, 440 A.2d 215 (1981) ("Both under our law and under the [Uniform Fraudulent Conveyance Act], a conveyance may judicially be declared void and set aside as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of purchase, if the conveyance was fraudulent. . . . A conveyance is fraudulent if made with actual intent to avoid any debt or duty *or if made without any substantial consideration by a person who is or will be thereby rendered insolvent. . . . A person is insolvent for these purposes when he is unable to pay his then-existing debts.*" [Citations omitted; emphasis added.]). Of course, the plaintiff may recover no more than the value of the assets transferred. See *Robinson* v. *Coughlin*, 266 Conn. 1, 11, 830 A.2d 1114 (2003) ("although a creditor may recover the value of the asset transferred, such recovery is allowed under [General Statutes] § 52-552i [b] only to the extent that the transfer is voidable under [General Statutes] § 52-552h [a] [1]");

*Derderian* v. *Derderian*, 3 Conn. App. 522, 529, 490 A.2d 1008 ("[c]ommon law principles do not authorize a general creditor to pursue the transferee in a fraudulent conveyance action for anything other than the specific property transferred or the proceeds thereof"), cert. denied, 196 Conn. 810, 811, 495 A.2d 279 (1985).

We express no opinion as to whether any defenses might be available under the facts and circumstances of a particular case. Moreover, we note that our conclusions herein have no bearing on whether the plaintiff may seek to recover under other equitable doctrines, such as quantum meruit, for the defendant's alleged unauthorized use of the plaintiff's photographs.

We therefore conclude that the answer to the first certified question is: No. We answer the third certified question as follows: If Greater Hartford has transferred any of its assets to another entity and the plaintiff can establish that the assets were fraudulently conveyed, that entity may be responsible for Greater Harford's obligations to the extent of the value of the assets received.

In this opinion the other justices concurred.

[1] As we explain later in this opinion, under § 10-397a, a regional district may assume the liabilities of a local district if, inter alia, such a decision is approved by the regional district's board of directors and an oversight body, currently the Department of Economic and Community Development.

[2] As a threshold matter, the District Court sua sponte raised and resolved affirmatively the question of whether diversity of citizenship existed to support its jurisdiction. Specifically, the court determined that the defendant is not an arm of the state, which would preclude it from being a citizen of the state of Connecticut under 28 U.S.C. § 1332. The court recognized the multifaceted nature of tourism districts and determined that, on balance, the weight of considerations favored the conclusion that the defendant functions as an autonomous entity akin to a political subdivision or public corporation, rather than an arm of the state.

[3] We note that, in contradiction to the position that it had taken before the District Court, the defendant contends in its brief to this court that the factual record is insufficient as a matter of law for this court to address any of the certified questions. In particular, it contends that, because one of the municipalities that comprised Greater Hartford was assigned to another regional district, that regional district also must be made a party to the proceedings. We conclude that the record and the statutory scheme provide an adequate basis for us to resolve the certified questions.

[4] At oral argument before this court, the defendant indicated that it and Greater Hartford had registered with the state as tax exempt corporations under § 501 (c) of the Internal Revenue Code in order to provide tax incentives for private donors. Counsel for the defendant conceded that the defendant had been given poor advice to file a name change rather than to file its own paperwork if it intended to make clear its distinct identity from that of Greater Hartford. We note that the plaintiff has asserted no claims that it relied to its detriment on actions taken by the defendant with regard to this action.

[5] In support of this finding, the District Court cited an affidavit by Deborah Moore, who had served the defendant as its industry representative when the defendant drafted its bylaws in 2003, as its director from 2005 to 2008, and as a board member thereafter. Moore also was a former chairperson of the Connecticut River Valley and Shoreline Visitors Council. It is unclear from the record how or whether this council relates to the local tourism districts. Moore stated in her affidavit that, in 2003, she had advised a representative of the plaintiff that "the various districts were in dissolution and out of business." The plaintiff submitted an affidavit disputing this communication. We note that Moore did not attest to any facts specifically related to Greater Hartford, either with respect to whether Greater Hartford

retained assets or was subject to liabilities other than those claimed in this case following its dissolution.

[6] In response to questioning at oral argument before this court, the defendant was unable to identify any statute authorizing its incorporation. It suggested that such authority could have arose under the scheme creating the local districts, but also was unable to identify any specific authority for the local districts' incorporation. Nonetheless, we note that the corporate status of neither entity directly bears on our resolution of the certified questions.

[7] The 2009 Public Act; Public Acts, Spec. Sess., September, 2009, No. 09-7, § 12; made no changes to the eastern regional district, merged the south central regional district into the defendant, and combined the northwestern and southwestern regional districts into the western regional district. See General Statutes (Rev. to 2011) § 10-397 (a).

[8] General Statutes (Rev. to 2005) § 10-397a provides: "(a) As used in this section:

"(1) 'Commission' means the Connecticut Commission on Culture and Tourism created by section 10-392;

"(2) 'Executive director' means the executive director of the Connecticut Commission on Culture and Tourism appointed pursuant to section 10-393;

"(3) 'Former tourism district' means the tourism districts, as defined in section 32-302 of the general statutes, revision of 1958, revised to January 1, 2003; and

"(4) 'Regional tourism district' means one of the five regional tourism districts created by section 10-397.

"(b) Any former tourism district having a cash surplus, after accounting for all liabilities, may distribute such surplus to the regional tourism district or districts serving the towns formerly served by such district. Any distribution shall be divided among the new district or districts in accordance with the following schedule:

| Former District | New District(s) |
| --- | --- |
| Northeastern | Eastern (100%) |
| Southeastern | Eastern (100%) |
| North Central | Central (100%) |
| Greater Hartford | Central (95%) |
| | Northwestern (5%) |
| Central Connecticut | Central (80%) |
| | South Central (20%) |
| Connecticut Valley | Central (60%) |
| | South Central (40%) |
| Greater New Haven | South Central (67%) |
| | Northwestern (20%) |
| | Southwestern (13%) |
| Litchfield Hills | Northwestern (100%) |
| Housatonic Valley | Northwestern (100%) |
| Greater Waterbury | Northwestern (100%) |
| Greater Fairfield | Southwestern (100%) |

"(c) Any former tourism district may, with the approval of the executive director, transfer noncash assets, including fixed assets and leases, to a regional tourism district or districts serving the towns formerly served by such district.

"(d) Any regional tourism district may, by vote of its board of directors and with the approval of the commission, assume the liabilities of a former tourism district that served all or part of the area served by the new district. No such assumption shall be approved unless (1) the regional district's approved budget makes provision for the costs arising from the assumption of liability; and (2) the commission finds that the proposed assumption of liability is fair and equitable."

We note that the schedule in subsection (b) of former local districts refers to the "North Central" district, which did not exist as such, and omits the Tobacco Valley district, which was one of the eleven local districts. Because all of the towns formerly served by the Tobacco Valley district were assigned to the central regional district, we assume that the "North Central" district is the Tobacco Valley district.

[9] Evidence that some of the local districts continued to wind up their affairs following their dissolution is also reflected in General Statutes (Rev. to 2005) § 10-397b, which provides: "Any tourism district in existence on July 1, 2003, that terminates operations prior to January 1, 2004, may file a single audit report for the period from July 1, 2002, until the termination of such district's operations. Such audit shall in all other respects comply with the provisions of chapter 55b."

[10] General Statutes (Rev. to 2009) § 10-397a (b), as amended by Spec. Sess. P.A. 09-7, § 14, provides: "Any former tourism district having a cash surplus, after accounting for all liabilities, may distribute such surplus to the regional

tourism district or districts serving the towns formerly served by such district. Any distribution shall be divided among the new district or districts in accordance with the following schedule:

| Former District | New District(s) |
| --- | --- |
| Northeastern | Eastern (100%) |
| Southeastern | Eastern (100%) |
| North Central | Central (100%) |
| Greater Hartford | Central (95%) |
| | Western (5%) |
| Central Connecticut | Central (100%) |
| Connecticut Valley | Central (100%) |
| Greater New Haven | Central (67%) |
| | Western (33%) |
| Litchfield Hills | Western (100%) |
| Housatonic Valley | Western (100%) |
| Greater Waterbury | Western (100%) |
| Greater Fairfield | Western (100%)" |

[11] The legislature made technical changes to § 10-397a in 2011. See Public Acts 2011, No. 11-48, § 103. We note that, as of the 2011 changes, there is no provision addressing what a local district may or must do with its surplus cash if it has accounted for all liabilities and elected not to distribute those cash assets to the region(s) prescribed in the schedule. It is unclear whether the legislature has declined to do so because of the fact that private donors also contributed funds to the districts.

[12] General Statutes § 10-392 (d) was amended during a special session in May, 2004; see Public Acts, Spec. Sess., May, 2004, No. 04-2, § 30; and references to the Connecticut Commission on Arts, Tourism, Culture, History and Film were replaced with the Connecticut Commission on Culture and Tourism.

[13] General Statutes § 4-38d provides for the transfer or assignment of functions, powers, or duties of a department, institution, or agency to a successor department, institution, agency or authority. General Statutes § 4-39 provides for a transfer of appropriations upon the transfer of functions.

[14] The District Court, in its memorandum of decision, cited the following common-law rules: "It has long been established that when a legislature dissolves a municipal corporation and creates a new legal entity composed of substantially the same population and encompassing substantially the same territory, the new municipal entity is the legal successor to the rights and obligations of the dissolved entity. . . .

"State and federal courts have widely adopted the corollary rule that when a municipal entity succeeds to the rights and obligations of a predecessor entity, the reorganized entity is liable for its predecessor's contractual obligations. . . . In the absence of any express statutory provision to the contrary, therefore, courts presume that a legislature intends for a reorganized municipal corporation to remain subject to the liabilities of its predecessor corporation. . . .

"This rule has been justified on the ground that the successor entity benefits from obligations undertaken by the predecessor, and because either the successor entity or the state must assume the liability in order to avoid impairing contractual obligations. . . . As the [United States] Supreme Court explained in *Mobile* v. *Watson*, [116 U.S. 289, 305, 6 S. Ct. 398, 29 L. Ed. 620 (1886)], the remedies for the enforcement of such obligations assumed by a municipal corporation, which existed when the contract was made, must be left unimpaired by the legislature, or, if they are changed, a substantial equivalent must be provided so as to comply with the Constitution." (Citations omitted; internal quotation marks omitted.)

We note that the authority cited by the District Court does not involve application of these common-law rules to an entity like the tourism districts, which have indicia of being an arm of the state, a quasi-municipal corporation, and a quasi-private corporation. We further note that tourism districts, unlike municipalities, lack taxing authority that would enable them to raise funds to satisfy unanticipated liabilities.